[No. S004684. Crim. No. 24551. June 21, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
PATRICK BRUCE GORDON, Defendant and Appellant.

COUNSEL

Frank O. Bell, Jr., Harvey Zall and Fern M. Laetham, State Public Defenders, and Monica Knox, Acting State Public Defender, under appointment by the Supreme Court, Dee A. Hayashi and Michael Tanaka, Deputy State Public Defenders, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Edmund D. McMurray, Lisbeth M. P. Bellet and Ward A. Campbell, Deputy Attorneys General, for Plaintiff and Respondent.

---

OPINION

MOSK, J.—This is an automatic appeal (Pen. Code, § 1239, subd. (b)) from a judgment of death under the 1978 death penalty law (*id.*, § 190.1 et seq.).

Together with his brothers, Bernard Patrick Gordon (hereafter Bernard) and Michael Eugene Caputo (hereafter Michael), defendant Patrick Bruce Gordon was charged with conspiracy (Pen. Code, § 182) to commit murder (*id.*, § 187) and robbery (*id.*, § 211); the murder of William Camp Wiley; and the robbery of the same individual. As to the murder charge, a felony-murder-robbery special circumstance (*id.*, § 190.2, subd. (a)(17)(i)) was alleged against all three men. As to both the murder and robbery charges, personal use of a firearm (*id.*, § 12022.5) was alleged against Bernard and Michael. All three men pleaded not guilty and denied the allegations. Defendant was tried separately. A jury found him guilty as charged and determined the special circumstance allegation was true. It subsequently fixed the penalty at death. The court entered judgment accordingly.

As we shall explain, we conclude that the judgment must be affirmed.

## I. FACTS

### A. *Guilt Phase*

At the guilt phase the prosecution's theory was that defendant was responsible with his brothers for the crimes charged—specifically, he was liable for the robbery and murder by aiding and abetting them as their getaway driver, or at least by conspiring with them to commit the offenses. The issues subject to greatest dispute were identity, intent, and degree of participation. To support its theory, the prosecution presented evidence in

its case-in-chief relating directly to the crimes charged and also to certain prior uncharged offenses. The tale told is in substance as follows.

On November 15, 1982—about 13 months before the commission of the crimes for which defendant was standing trial—Mark Allen Freed, a courier for an armored-car service, was robbed and murdered in the sales area of a K mart store in Riverside after he picked up the business's receipts for deposit to its bank account. Freed was carrying the receipts and was armed with a .38-caliber revolver. He was accosted by two men with handguns and without masks. Soon shots rang out. One of the men fired two rounds of Winchester Western .45-caliber automatic ammunition from a .45-caliber automatic or semiautomatic pistol possibly manufactured by Star; both bullets went through Freed, and one apparently lodged in the shooter's partner. That man fired one round of 9-mm. Luger ammunition from a 9-mm. Luger pistol; the bullet went through Freed and apparently lodged in the shooter's partner. Freed fired his revolver and hit the man who was armed with the .45-caliber pistol. Freed was shot through the chest, behind the left ear, and in the upper left arm, and died as a result of the chest wound. The perpetrators fled through a fire exit at the rear of the store, taking with them Freed's gun as well as the business's receipts.

Evidence connected defendant and his brothers to the Riverside K mart incident. For example, at the scene of the shooting was found a hat; it matched one to which defendant and his brothers evidently had access. Also discovered was a trail of blood leading from the scene to the fire exit; the blood could have come from about 7 percent of the Caucasian population in the state, including defendant but not his brothers. Moreover, some time before the incident, defendant had purchased a Star .45-caliber semiautomatic pistol from a firearms dealer; he had sought, and received, a "powerful and concealable" weapon.

Further, some time before November 25, 1982, Bernard left California with defendant and Michael, driving a red pickup truck with a camper shell; defendant and Michael had recently sustained gunshot wounds, the former to his hip and arm, the latter to his stomach. The trio set out for the house of their uncle, Dennis Rauch, who lived in Hinesville, Georgia. Rauch was a sergeant in the Army, had served in Vietnam, and was quite familiar with gunshot wounds. Bernard had evidently informed Rauch of the injuries suffered by defendant and Michael, and Rauch told Bernard to bring them to him for treatment.

On November 26 the trio arrived at Rauch's house. Rauch checked the wounds sustained by defendant and Michael. He determined defendant's arm was broken; he recommended a hospital visit, but it was decided that

such a visit should take place only after the gunshot wounds had healed. Rauch began to treat the injuries. At Bernard's request, and with his offer of a sum between $1,000 and $2,000, Clark Pace traveled from California to Hinesville and, once there, assisted Rauch in the treatment. Bernard stayed about three days. Rauch took him to the Savannah airport for a flight back to California, and received $2,000. After defendant's gunshot wounds had healed sufficiently, Rauch took him to a hospital in Hinesville and from there to a hospital in Savannah. Defendant and Michael eventually returned to California. They bore scars and other indications of the wounds they had suffered.

Finally, after a physical lineup conducted on February 3, 1984, defendant was identified as one of the perpetrators by Beverly Gomez, a K mart employee who had witnessed the incident. (Gomez, however, did not identify defendant at trial.)

On December 18, 1983, William Camp Wiley, a courier for an armored-car service, was robbed and murdered in the sales area of a K mart store in Stockton after he picked up the business's receipts for deposit to its bank account. Wiley was carrying the receipts and was armed with a .38-caliber revolver. He was accosted by two men with handguns and without masks. Soon shots rang out. One of the men fired three rounds of Remington Peters 9-mm. Luger ammunition from a 9-mm. Browning Luger pistol. The other fired one round of Winchester Western .38-caliber Super Plus P automatic ammunition, apparently from a .38-caliber automatic or semiautomatic pistol. Both hit their mark: Wiley was shot three times in the chest and once in the abdomen, and died as a result of his wounds. The perpetrators fled through a fire exit at the rear of the store, taking with them Wiley's gun as well as the business's receipts.

Evidence connected defendant and his brothers to the incident at the Stockton K mart as well as that at the Riverside store. For example, at and around defendant's residence in Chino the following items, among others, were found: a police call radio directory for states including California, bearing defendant's fingerprints, with marks at several frequencies used by the Stockton Police Department; a similar directory, with marks at several frequencies apparently used by the Riverside Police Department; two portable programmable scanning radios capable of monitoring police broadcasts; two handheld transceivers or "walkie-talkies" with clip-on microphones; ten rounds of Remington Peters 9-mm. Luger ammunition; two Browning 9-mm. barrels, which had been sent to Michael in care of defendant; more than $1,000 in cash; and a map of Tucson, Arizona, bearing defendant's fingerprints, with marks indicating, among other things, the location of certain K mart and similar stores.

At and around Bernard's residence in Upland the following items, among others, were discovered: the Browning 9-mm. Luger pistol used in the crimes committed at the Stockton K mart, fitted with a different barrel; a portable programmable scanning radio capable of monitoring police broadcasts, which had in fact been tuned to one of the main channels used by the Stockton Police Department; a registration slip and other title documents relating to a beige Chevrolet station wagon, purchased by defendant in San Diego under an assumed name for cash, which was evidently used in the Stockton crimes and then abandoned; more than $13,000 in cash; a police call radio directory for states including Arizona, with marks at several frequencies apparently used by law enforcement authorities in Phoenix; and a map of Phoenix, bearing defendant's left palm print, with marks indicating, among other things, the location of certain K mart stores.

At Michael's residence in Upland was found, among other items, Winchester Western .38-caliber Super Plus P automatic ammunition—the kind of ammunition used by one of the perpetrators at the Stockton K mart.

Further, while they were in custody after their arrest, defendant and Bernard passed coded notes which were intercepted, and partially decoded, by the jailers. Defendant sent a note that read in part: "Talked to said wife, worried about Denny [i.e., Dennis Rauch] cracking. I agree with you pizza [?] would stop. If not I'll tell your story. Biggest thing against me is marks on call book for here. I saw the reg. slip on wagon . . . , that's scary." Bernard responded with a note, "Were you talking about the station wagon?" Defendant replied with a note that read in part: "Yes, on station wagon . . . , it's a registration slip." The station wagon was subsequently found abandoned about a block from the Stockton K mart.

Finally, at trial Bernard and Michael were named as the shooters at the Stockton K mart by several witnesses who had observed the incident. Defendant had been seen by one witness shortly before the event: he was sitting in the driver's seat of what was apparently the beige Chevrolet station wagon, which was parked near the store; with him in the vehicle were two other men. One witness testified she had seen Bernard and possibly defendant acting suspiciously in the store during the week preceding the incident, the former twice and the latter once.

The theory of the defense was that defendant was not involved at all in the charged crimes committed at the Stockton K mart or in the uncharged offenses relating to the Riverside K mart—or that at most he may have been an accessory to the former. The defense took the position that defendant was not at either store at any time pertinent here. As to both Stockton and Riverside, it presented a defense of mistaken identity. As to Stockton alone,

it offered a defense of alibi: on the day in question, defendant was not in Stockton but rather several hundred miles away in Southern California. In support, it introduced various evidence in its case-in-chief. For example, Professor Elizabeth Loftus gave expert opinion on eyewitness testimony and its unreliability under certain circumstances. And Romelia Popkins, defendant's mother-in-law, stated defendant was in Southern California on the day of the Stockton crimes. The defense also introduced character evidence. Colonel Michael J. McGowan of the United States Marine Corps testified that defendant had been a member of the corps; he had served under him between 1977 and 1979; he was reputed to be honest and nonviolent, and in his opinion he was actually so; and he was not the type of man to have committed the crimes charged.

In rebuttal, the prosecution called a jailhouse informer named Billy Ray Colbert. Colbert testified that he had been in custody with defendant and had talked to him: defendant, he said, admitted involvement in both the charged crimes committed at the Stockton K mart and the uncharged offenses relating to the Riverside K mart. The prosecution also introduced evidence showing that shortly after the Stockton crimes, defendant and his wife engaged in several large cash transactions—even though defendant was evidently unemployed and his wife was definitely so. For example, they opened a joint checking account with a deposit of $1,000 in cash and $127.91 in checks. (On the signature card defendant stated he was employed by U.S. Rooter, a sewer and drain cleaning service; in actuality, he had left the firm almost two years earlier.) Around the same time, defendant's wife opened trust accounts for their children with cash deposits totalling $1,000.

In surrebuttal, the defense called witnesses including a jailhouse informer named William Tiller. Tiller testified that he had been in custody with Billy Ray Colbert and had talked to him: Colbert, he said, admitted that defendant had made no admissions in his presence.

## B. Penalty Phase

At the penalty phase, the prosecution relied on the evidence offered at the guilt phase and did not introduce any evidence in aggravation.

The defense presented evidence in mitigation. It was in substance as follows.

Deprivation and neglect shadowed defendant's early life. His father, Robert Gordon, and his mother, Denise Rauch, married in 1954 after she became pregnant; he was 19 years old and she was 16. Evidently Bernard

was born in 1954, and defendant in 1957. The marriage was stormy and family life troubled. When Bernard was about five and defendant about two, Denise abandoned the home. At that time she was pregnant with Robert's child. The marriage was dissolved. She soon married Jerry Caputo, delivered Michael, and gave the child "Caputo" as his surname. Robert had custody of Bernard and defendant, but provided them with inadequate care. When Bernard was about seven and defendant about four, dependency proceedings were initiated; subsequently, the boys were removed from Robert's home, committed to an orphanage, placed in foster care, and eventually—when they were about thirteen and ten respectively—returned to Robert. The following years in Robert's home were not without trouble: for example, Robert drank to excess, and he favored Bernard and disfavored defendant.

At 17 years of age defendant joined the Marines. He served honorably for six years and was honorably discharged. At age 26—between the incidents at the Riverside and Stockton K mart stores—he married Carlene Popkins; they have three children, one of their own and two brought by Carlene from a previous marriage. Carlene testified that she loved defendant and had no plans to dissolve their marriage.

Also, testimony was presented about the nature of prisons and imprisonment and the contributions life prisoners could make to the institution and to themselves. It was stipulated that defendant had no prior criminal record.

## II. GUILT ISSUES

A. *Denal of Motion to Bar Evidence of the Riverside K mart Incident*[1]

 ▮ Prior to trial, defendant moved to bar evidence relating to other crimes, including the Riverside K mart incident. He argued that the evidence was not relevant under Evidence Code section 210 and, in any event, was excludable as unduly prejudicial under Evidence Code section 352. The former provision defines "relevant" as "having any tendency in reason to *prove or disprove any disputed fact that is of consequence to the determina-*tion of the action." The latter declares that "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of

---

[1] Defendant raises this claim in a supplemental brief. He recently applied for permission to submit the brief; we granted the application and ordered the brief filed. The People ask us to reconsider our decision, deny the application, and strike the filing. We deny their request.

time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

The prosecution opposed the motion. It argued that the evidence was relevant to the material issues of identity and intent, and was not unduly prejudicial.

After a hearing, the court denied the motion. It stated as follows. "The evidence meets the test of relevance in that it tends logically, naturally and by reasonable inference to establish material issues required to be proved by the prosecution, and the court finds further that the probative value of the evidence is substantial, and relevant to the disputed issues of identity and intent, among others, and substantially outweighs the prejudicial effect thereof. [¶] The court finds a sufficiently distinctive combination of circumstances to warrant the conclusion that the court has reached, and that is the order of the court."

Defendant contends that the court's ruling was erroneous. The appropriate standard of review is abuse of discretion: the ruling comprises determinations as to relevance and undue prejudice; those determinations are each reviewed under that standard (see *People* v. *Green* (1980) 27 Cal.3d 1, 19-20 [164 Cal.Rptr. 1, 609 P.2d 468] [relevance]; *People* v. *Karis* (1988) 46 Cal.3d 612, 637 [250 Cal.Rptr. 659, 758 P.2d 1189] [undue prejudice]). (*People* v. *Matson* (1974) 13 Cal.3d 35, 40 [117 Cal.Rptr. 664, 528 P.2d 752].)

Having considered the matter closely, we find no error. As even a cursory review of the facts reveals (see part I.A, *ante*), the court could have reasonably determined that evidence of the Riverside K mart incident had at least some tendency to prove identity and intent, and was not substantially more prejudicial than probative. Certainly, its finding that there was "a sufficiently distinctive combination of circumstances" between the crimes at Riverside and those at Stockton is altogether sound.

Defendant argues to the contrary. In so doing, he relies on *People* v. *Thompson* (1980) 27 Cal.3d 303 [165 Cal.Rptr. 289, 611 P.2d 883]. In that case, we stated that the admissibility of "other crimes" evidence "depends upon three principal factors: (1) the *materiality* of the fact sought to be proved or disproved; (2) the *tendency* of the uncharged crime to prove or disprove the material fact; and (3) the existence of any *rule* or *policy* requiring the exclusion of relevant evidence." (*Id.* at p. 315, italics in original.)

Defendant concedes the first factor is met. In this he does only what necessity demands: it is pellucid that identity and intent are indeed material. He disputes, however, the second and third factors. We cannot agree. The

circumstances of the Riverside K mart incident are such as to support a reasonable inference that defendant was involved in the crimes at the Stockton K mart as the getaway driver, and that he shared the shooters' intent. Further, contrary to defendant's assertion no rule or policy requires exclusion. Evidence Code section 352 does not: as the court soundly determined, the evidence was not substantially more prejudicial than probative. Nor does Evidence Code section 1101. That provision bars evidence of other crimes "when relevant to prove" only a person's "disposition to commit such . . . act[s]." (*Id.*, subd. (b).) It does *not* bar such evidence when it is "relevant to prove some [other] fact," such as "identity" or "intent" (*ibid.*), without reliance on disposition as "any link in the chain of logic" (*People* v. *Thompson, supra,* 27 Cal.3d at p. 317). ██ ██ ██ ██ ██ Here, the "distinctive combination of circumstances" between the Riverside and Stockton incidents shows, without resort to mere "disposition," that the perpetrators were the same persons and that they acted with the same intent.[2]

### B. *Denial of Motion to Bar Identification Testimony Concerning the Riverside K mart Incident*

Before trial defendant moved to bar Beverly Gomez from identifying him as one of the shooters in the Riverside K mart incident or from testifying she had so identified him previously. He based his motion in part on a claim that any identification by Gomez was, or would be, so unreliable as to violate his right to due process of law under the Fourteenth Amendment. The court held a hearing on the motion and made a ruling. It subsequently granted a motion by the prosecution to reopen, held another hearing, and made a final ruling. In making that ruling, it found facts expressly or impliedly. As relevant here, those facts are as follows.

On November 15, 1982, Gomez, a Riverside K mart employee, saw a man acting suspiciously; soon he confronted a courier for an armored-car service, pulled out a handgun, and stuck it in the courier's side; a second man came to support the first; she was about five or six feet away, the store was well lit, and she could see the face of the first man, who was turned

---

[2] Defendant claims the court's ruling was error under the United States Constitution as well as the Evidence Code. He argues that the ruling violated his right to due process under the Fourteenth Amendment. We reject the point at the threshold. It is, of course, "the general rule that questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be urged on appeal." (*People* v. *Rogers* (1978) 21 Cal.3d 542, 548 [146 Cal.Rptr. 732, 579 P.2d 1048].) At trial defendant failed to make a sufficient objection that the admission of the evidence of the Riverside K mart incident would violate his federal constitutional right to due process.

toward her and wore no mask; she concentrated her attention on the gun; he then shot the courier.

Not long after the incident, Gomez gave the police a general, but somewhat vague, description of the man she saw shoot the courier, noting, inter alia, that he looked "like a football player," tall and well built. Subsequently, she gave other, varying descriptions. Evidently on several occasions she was shown arrays of photographs of suspects. In at least one defendant's photograph appeared, but she was unable to make a positive identification.

On February 3, 1984, Gomez viewed three physical lineups. Bernard, Michael, and defendant were in custody as suspects in the Riverside K mart incident. Gomez was given a form to fill out for each lineup: the form had a check box followed by the words, "I identify number _____ ," and another check box followed by the words, "I am unable to make an identification." One lineup included Bernard in position four with five other men. For this lineup Gomez checked the "no identification" box. Another lineup included Michael in position five with four other men; the man in position one bore a strong resemblance to defendant. For this lineup, too, Gomez checked the "no identification" box. The final lineup included defendant in position one with four other men. This time she did not check either the "identification" or the "no identification" box, but wrote: "Number 1 in the third lineup looks familiar, but I'm not certain." As she traveled home with her husband and reflected on the matter, she became certain (or at least virtually certain) that the man who "look[ed] familiar" was in fact the man she had seen shoot the courier.

Shortly after arriving home, Gomez received a telephone call from Detective Sergeant Albert J. Brown of the Riverside Police Department. At Brown's request, she discussed the lineups and her written comment about the third. In the course of the conversation he said words to the effect, "[Y]ou've picked the right person[.]" Subsequently, both out of court and in, she identified defendant as the man she had seen shoot the courier.

On these facts, the court ruled in substance as follows. It would not bar Gomez from testifying as to her identification of defendant in the Riverside K mart incident before Sergeant Brown's telephone call; but it would bar her from testifying as to any identification she may have made after the call, and also from identifying defendant at trial. It reasoned that the lineup was not "unduly suggestive": "I kept looking at the lineup and saying to myself, 'You know, these people look fairly much the same . . .'"; although defendant was the tallest participant in the lineup, all the others were tall as well; in spite of his physical characteristics, he was not "singularly marked for identification." It also reasoned that Gomez became certain (or at least

virtually certain) of her identification before the call: Gomez and her husband each gave credible testimony on the point. Finally, it reasoned that Sergeant Brown's remark was unduly suggestive and had a corrupting effect on any identification that did, or might, follow—but that in view of Gomez's certainty, it did not have such an effect on the preceding identification, as it were, "retroactively." At trial, Gomez testified as to her identification of defendant before the call.

■ Defendant contends that the court erred by ruling that Gomez could testify on her identification before her telephone conversation with Sergeant Brown, without offense to the due process clause of the Fourteenth Amendment.

■ Whether an extrajudicial identification admitted at trial is so unreliable as to violate a criminal defendant's right to due process of law under the Fourteenth Amendment is governed by principles stated in *Manson* v. *Brathwaite* (1977) 432 U.S. 98 [53 L.Ed.2d 140, 97 S.Ct. 2243]. Those principles—although variously phrased in various state and federal decisions—establish the following structure of analysis.

The issue of constitutional reliability depends on (1) whether the identification procedure was unduly suggestive and unnecessary (*Manson* v. *Brathwaite, supra,* 432 U.S. at pp. 104-107 [53 L.Ed.2d at pp. 147-150]); and if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation (*id.* at pp. 109-114 [53 L.Ed.2d at pp. 150-154]). If, and only if, the answer to the first question is yes and the answer to the second is no, is the identification constitutionally unreliable. (*Id.* at pp. 104-107, 109-114 [53 L.Ed.2d at pp. 148-149, 150-154].)

■ After close consideration, we find no error in the court's ruling. The court determined that the identification procedure at the lineup was not unduly suggestive, and that Sergeant Brown's remark was not unduly suggestive "retroactively." It is unsettled whether suggestiveness is a question of fact (or a predominantly factual mixed question) and, as such, subject to deferential review on appeal, or a question of law (or a predominantly legal mixed question) and, as such, subject to review de novo. (Compare *Cikora* v. *Dugger* (11th Cir. 1988) 840 F.2d 893, 895-896 [supporting the former position] and *People* v. *Martinez* (1989) 207 Cal.App.3d 1204, 1220 [255 Cal.Rptr. 691] [same] with *Cikora* v. *Dugger, supra,* at pp. 899-900 (conc. &

dis. opn. of Clark, J.) [supporting the latter position] and *United States* v. *Johnson* (9th Cir. 1987) 820 F.2d 1065, 1072 [same].) But even under independent review, the court's determination was sound: the supporting reasoning, which is set out above, is convincing.

Defendant argues that the lineup was unduly suggestive, and intentionally so. We reject the claim of bad faith: it is wholly without support in the record. We also reject the claim of undue suggestiveness. Defendant asserts that contrary to the court's express determination, his height and build singularly marked him for identification. But having scrutinized the record, including the photographs of the lineup, we must disagree. All the participants in defendant's lineup bore a general resemblance to one another; although defendant was the tallest, all the others were tall as well. Moreover, one of the participants in Michael's lineup, which preceded defendant's, bore a strong resemblance to defendant.

Defendant also argues that Sergeant Brown's remark was unduly suggestive "retroactively." But the record establishes that Gomez did indeed become certain (or virtually certain) of her identification before the call: Gomez and her husband credibly testified to that effect below, and their testimony provides more than adequate support.

It may well be, as defendant strenuously urges, that Gomez's identification was not the most reliable. But the admission of such testimony does not violate due process in and of itself.

" 'It is part of our adversary system that we accept at trial much evidence that has strong elements of untrustworthiness—an obvious example being the testimony of witnesses with a bias. While identification testimony is significant evidence, such testimony is still only evidence, and, unlike the presence of counsel, is not a factor that goes to the very heart—the "integrity"—of the adversary process.

" 'Counsel can both cross-examine the identification witnesses and argue in summation as to factors causing doubts as to the accuracy of the identification—including reference to both any suggestibility in the identification procedure and any countervailing testimony such as alibi.' " (*Manson* v. *Brathwaite, supra*, 432 U.S. at pp. 113-114, fn. 14 [53 L.Ed.2d at pp. 153], quoting, without footnote, *Clemons* v. *United States* (D.C. Cir. 1968) 408 F.2d 1230, 1251 [133 App.D.C. 27] (conc. opn. of Leventhal, J.).)

Here defense counsel did indeed cross-examine Gomez on her identification and argued against its reliability, and did so vigorously. There was no denial of due process.[3]

C. *Denial of Request for In Camera Hearing in Conjunction With Pretrial Motion for Separate Juries*

On the very eve of voir dire, defendant made an oral motion, without advance notice to the prosecution, for the impanelment of separate juries for the issues of guilt and penalty. At the same time, he made an oral request, also without advance notice, for a hearing in camera, outside the presence of the prosecution, at which he could disclose his reasons. The court denied the request. And it denied the motion without prejudice. Immediately before the penalty phase, defendant renewed the motion but not the request. The court denied the motion.

██ Defendant contends that the court erred when it denied his request for an in camera hearing. In the general case at least, the decision whether or not to grant such a request is evidently entrusted to the court's sound discretion. Its decision must therefore be reviewed for abuse of that discretion. Under that standard, no error appears. In support of the request, defense counsel baldly asserted that they could adequately argue their separate-juries motion only by disclosing their strategy and tactics, and that they would make such a disclosure only in camera. The court found the assertion unpersuasive. On this record, we cannot conclude that the court was unreasonable in its determination. In any event, defendant does not show—and certainly we cannot discern—any prejudice arising from the ruling.

D. *Denial of Motion for Disclosure of Informer's Identity*

Prior to trial, defendant moved for an order directing the prosecutor to disclose the identity of an informer. He claimed in substance that there was a reasonable possibility that nondisclosure might deprive him of a fair trial. In support defense counsel declared on information and belief to the following effect: the informer stated only two persons participated in the crimes at the Stockton K mart; Bernard and Michael were positively identified as the shooters; as a result, the informer might have evidence tending to exonerate defendant. The prosecution opposed the motion.

---

[3] Defendant claims the court erred by ruling Gomez could testify on her identification before her telephone conversation with Sergeant Brown, without offense to the due process clauses of article I, sections 7 and 15, of the California Constitution. He fails, however, to support the point with adequate argument. Hence, we reject the claim as not properly raised. (*People v. Bonin* (1989) 47 Cal.3d 808, 857, fn. 6 [254 Cal.Rptr. 298, 765 P.2d 460].)

The court conducted a hearing in open court pursuant to Evidence Code section 1042, subdivision (d). Defendant called as his sole witness Detective Sergeant Robert Davis Wingo of the Stockton Police Department, who was one of the officers investigating the crimes committed at the Stockton K mart. The prosecutor called no witnesses. As relevant here, Wingo testified in substance as follows: the informer provided no information whatever concerning the crimes at the Stockton K mart; he did furnish specific information about the incident at the Riverside K mart, among others, identifying Bernard, Michael, and defendant as participants along with possibly two other persons; the informer was not a participant or a percipient witness, but had obtained the information directly from one of the brothers; and he gave the information to an unnamed person, who gave it in turn to an unnamed law enforcement official, who finally gave it (directly and indirectly) to Wingo, who used it in the investigation leading to the arrest of defendant and his brothers. Defense counsel asked Wingo the identity of the informer. Wingo responded he did not know. Counsel asked him the identity of the unnamed law enforcement official. Claiming the privilege of Evidence Code section 1041, which protects from disclosure the identity of informers, he refused to answer.

On the prosecution's request, pursuant to Evidence Code section 1042, subdivision (d), the court then held a hearing in camera, outside the presence of defendant and his counsel, to rule on Sergeant Wingo's claim of privilege. The in camera proceedings were reported; a transcript was subsequently made and sealed.

Returning to open court, the court made a tentative ruling sustaining Sergeant Wingo's claim of privilege and denying defendant's motion for disclosure of the informer's identity. It subsequently made a final ruling to the same effect. It stated that it was troubled by the presence of multiple hearsay and the absence of the informer. But it determined that "the necessity for keeping [the informer's] identity secret, that is the individual's safety, outweighs the need for the identity of the informant [to] be made known to the defense for a proper defense of the case. In other words, the court's ruling is I don't see any reasonable possibility that the defendant will not get a fair trial despite the fact he doesn't know the identity of the informant."

Defendant contends that the court erred by denying his motion for disclosure of the informer's identity: contrary to the court's determination, he claims, there was a reasonable possibility that nondisclosure might deprive him of a fair trial.

The standard of review applicable to the determination under challenge is not settled. (Compare, e.g., *People* v. *Otte* (1989) 214 Cal.App.3d 1522,

1535-1536 [263 Cal.Rptr. 393] [suggesting review de novo] with *People* v. *Alderrou* (1987) 191 Cal.App.3d 1074, 1078, 1080 [236 Cal.Rptr. 740] [assuming review for abuse of discretion]; see *People* v. *Louis* (1986) 42 Cal.3d 969, 985-987 [232 Cal.Rptr. 110, 728 P.2d 180] [dealing generally with standards of review].)

But having scrutinized the record in its entirety, including the sealed transcript of the in camera proceedings, we are of the opinion that the court's determination was sound under any standard.

██ It is, of course, the defendant who bears "the burden . . . to make a sufficient showing that the unnamed informer does have information which would be material to the defendant's guilt. [Citations.] This burden is met only where the defendant demonstrates through 'some evidence' [citation] that there exists a ' "reasonable possibility that the anonymous informant whose identity is sought could give evidence on the issue of guilt which might result in defendant's exoneration." ' " (*People* v. *Hardeman* (1982) 137 Cal.App.3d 823, 828 [187 Cal.Rptr. 296], italics omitted.)

██ Defendant did not carry his burden. We recognize that he encountered difficulties through the presence of multiple hearsay and the absence of the informer. But there is no blinking the fact that he did not present any evidence whatever suggesting that the informer had information that might have been helpful to his case. As noted above, he rested his motion on counsel's declaration—on information and belief—that the informer stated only two persons participated in the crimes at the Stockton K mart; Bernard and Michael were positively identified as the shooters; as a result, the informer might have evidence tending to exonerate defendant. But there was absolutely no support in the evidence presented at the hearing for the crucial assertion that the informer stated only two persons participated in the crimes at the Stockton K mart. Accordingly, we conclude that there was not a reasonable possibility that nondisclosure of the informer's identity might deprive defendant of a fair trial.

E. *Overruling of "For Cause" Challenges to Prospective Jurors*

During voir dire, defendant challenged three prospective jurors for cause on the basis of actual bias. The court overruled the challenges. It turned out that none of the three sat on the jury sworn to try the case: one was never drawn into the box, and the other two were removed on peremptory challenge by the defense. When the jurors were sworn, defendant did not indicate any dissatisfaction with the panel and in fact had a peremptory challenge remaining.

■ Defendant contends that the court erred by overruling his "for cause" challenges. For purposes here we shall assume the court did in fact err. But as will be shown, reversal is not required.

■ It appears that with the exception of an improper "*Witherspoon* exclusion" (*Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770]), an erroneous ruling on a "for cause" challenge is not automatically reversible but is subject to scrutiny for prejudice under harmless-error analysis. Certainly, this is true of an erroneous ruling *denying* such a challenge. (*People* v. *Coleman* (1988) 46 Cal.3d 749, 768-771 [251 Cal.Rptr. 83, 759 P.2d 1260]; see *People* v. *Bittaker* (1989) 48 Cal.3d 1046, 1088 [259 Cal.Rptr. 630, 774 P.2d 659] [following *Coleman*].) ■ Since the exception is plainly inapplicable here, the general rule operates. After review, we can discern no prejudice. None of the prospective jurors whom defendant found objectionable actually sat on his jury. Hence, none could have tainted the panel's members with his alleged bias. Accordingly, none could have affected the process or result of the deliberations to defendant's detriment.

Defendant disagrees with our conclusion that reversal is not required. He first argues against the applicability of harmless-error analysis. He relies on language in *Gray* v. *Mississippi* (1987) 481 U.S. 648 [95 L.Ed.2d 622, 107 S.Ct. 2045], that "the relevant inquiry is 'whether the composition of the *jury panel as a whole* could have been affected by the trial court's error.'" (*Id.* at p. 665 [95 L.Ed.2d at p. 637], italics in original.) But that language was all but disapproved in *Ross* v. *Oklahoma* (1988) 487 U.S. 81 [101 L.Ed.2d 80, 108 S.Ct. 2273]: "the broad language used by the *Gray* Court is too sweeping to be applied literally, and is best understood in the context of the facts there involved." (*Id.* at pp. 87-88 [101 L.Ed.2d at p. 89], fn. omitted.) We are in accord. Defendant asks us to repudiate *Ross* and embrace *Gray,* but we cannot do so. In our view, "'whether the composition of the *jury panel as a whole* could have been affected by the trial court's error[],'" (*Gray* v. *Mississippi, supra,* 481 U.S. at p. 665 [95 L.Ed.2d at p. 637], italics in original) cannot be deemed the "relevant inquiry" (*ibid.*). It is the merest speculation whether an erroneous ruling on a "for cause" challenge might actually have had any significant effect and, if so, whether such effect might have helped or harmed the defendant. Hence, the inquiry identified by the *Gray* court cannot serve as a principled basis on which to conclude that the error should be deemed automatically reversible as a general matter, or even that it caused any harm in an individual case.

Defendant next argues against the applicability of harmless-error analysis at least when, as here, the death penalty is involved. But he simply fails to persuade us the exception he urges should be recognized.

Finally, defendant argues that he did indeed suffer actual prejudice as a result of the "error" here. Having reviewed the record, we cannot agree.

Defendant says he was harmed because he was "forced to accept" a jury he "was not satisfied with." But we discern in the record no dissatisfaction and no compulsion. Defendant says he was harmed because he was effectively denied two peremptory challenges when he chose to exercise those challenges to "cure" the "error." But we can find no denial. A criminal defendant may, and indeed must, exercise the peremptory challenges granted him by law "to remove prospective jurors who should have been excluded for cause" (*People* v. *Coleman, supra,* 46 Cal.3d at p. 770)—that is to say, to cure the very kind of error claimed here. In view of the foregoing, we simply cannot deem defendant's *exercise* of his peremptory challenges to amount to a *deprivation.*[4]

### F. *Admission of Extrajudicial Statement*

The prosecution sought to put Dennis Rauch on the stand as a witness in order to link his nephews Bernard, Michael, and defendant to the Riverside K mart incident. On voir dire outside the presence of the jury, Rauch claimed a privilege against self-incrimination under the Fifth Amendment and refused to testify. The prosecution petitioned the court under Penal Code section 1324 (hereafter section 1324) to grant Rauch immunity and compel him to testify. Rauch opposed the request. Defendant acquiesced in, and in fact supported, his position. The court denied the petition and up-

---

[4] Defendant claims in substance that the court's "error" (1) abridged his right to a fair trial by an impartial jury under the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 16, of the California Constitution, and (2) infringed his right to due process of law under the Fourteenth Amendment and article I, sections 7 and 15, by arbitrarily depriving him of his full complement of peremptory challenges. After review, we find no such violations.

Insofar as it rests on the United States Constitution, defendant's claim must be rejected under the reasoning of *Ross* v. *Oklahoma, supra,* 487 U.S. 81.

First, the court's refusal to remove the three prospective jurors for cause did not infringe on defendant's right to a fair trial by an impartial jury: none sat on his jury. That defendant had to use two peremptory challenges to cure the "error" as to two of the prospective jurors does not mean that the right in question was violated: the loss of those challenges does not constitute a deprivation of that right. (*Ross* v. *Oklahoma, supra,* 487 U.S. at pp. 85-88 [101 L.Ed.2d at pp. 88-90].)

Second, the court's refusal to remove the three prospective jurors for cause did not infringe on defendant's right to due process by arbitrarily depriving him of his full complement of peremptory challenges. Since peremptory challenges are a creation of state law and not constitutionally required, the right to exercise such challenges would be denied or impaired only if the defendant did not receive what the law provides. Although at the time relevant here state law gave capital defendants 26 peremptory challenges (former Pen. Code, § 1070, subd. (a), Stats. 1978, ch. 98, § 2, p. 261), it did so subject to the requirement that the defendant exercise those challenges to cure erroneous refusals to excuse prospective jurors for cause (*People* v. *Coleman, supra,* 46 Cal.3d at p. 770 [101 L.Ed.2d at p. 90-92]). This requirement was plainly not arbitrary. Accordingly, defendant received all that state law provided. (*Ross* v. *Oklahoma, supra,* 487 U.S. at pp. 88-91 [101 L.Ed.2d at pp. 89-92].)

Insofar as it rests on the California Constitution, defendant's claim must also be rejected. We find the reasoning of *Ross* to be applicable to the state constitutional analogues to the federal constitutional rights considered there. And we also find that reasoning persuasive.

held the claim of privilege. Rauch was not called to the stand before the jury.

Subsequently, at a hearing outside the presence of the jury, the prosecution moved to introduce for its truth an extrajudicial statement by Rauch. Rauch made the statement during questioning by police officers, including Sergeant Wingo, as to his dealings with Bernard, Michael, and defendant shortly after the Riverside K mart incident, which occurred on November 15, 1982. As relevant here, the statement was to the following effect.

At his house in Hinesville, Georgia, just before November 25, 1982—the statement began—Rauch received a telephone call from Bernard, who was apparently in California; he was told that defendant and Michael had sustained certain injuries; he was a sergeant in the Army, had served in Vietnam, and was quite familiar with gunshot wounds. He instructed Bernard to bring defendant and Michael to him for treatment. Subsequently, he received a call from Bernard every day and was informed where the trio were on their journey; he was asked how to treat the injuries; he said to stabilize defendant's arm between two boards and to pack Michael's stomach area with ice and administer aspirin every four hours.

On November 26—the statement continued—the trio arrived at Rauch's house in a red pickup truck with a camper shell. Rauch saw defendant and Michael lying in the camper section: defendant and Michael had suffered gunshot wounds, the former to his arm and hip, the latter to his stomach. The pair were ambulatory and walked into the house. Once there, Rauch checked their wounds more closely and determined defendant's arm was broken; he told defendant he should go to a hospital to have his arm checked, but it was decided that he should do so only after the gunshot wounds had healed. He began to treat the pair's injuries, obtaining what he needed from his wife and a friend. Bernard stayed at Rauch's house about three days. Rauch took him to the Savannah airport for a flight back to California, and received $2,000. After defendant's gunshot wounds had healed sufficiently, Rauch took him to a hospital in Hinesville and from there to a hospital in Savannah.

 Defense counsel objected to the admission of Rauch's statement under the hearsay rule. The prosecutor claimed the statement was excepted from the rule as a declaration against interest—specifically, *penal* interest: "Evidence of a statement . . . is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, . . . so far subjected him to the risk of . . . criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true." (Evid. Code, § 1230.) The prosecutor argued that

both requirements of the exception were satisfied: (1) Rauch was unavailable—he had claimed a privilege against self-incrimination under the Fifth Amendment and had refused to testify; and (2) the statement was against his penal interest—it subjected him to the risk of significant criminal liability. Defense counsel conceded the first requirement was met but disputed the second.

The court ruled that Rauch's statement was admissible under the declaration-against-interest exception to the hearsay rule. It determined that both the unavailability and against-interest requirements were satisfied. Subsequently, the statement was introduced into evidence.

Defendant contends that the court's ruling was error: Rauch's statement was hearsay; moreover, it did not come within the declaration-against-interest exception because neither the unavailability nor the against-interest requirement was met.

*Ex proprio motu,* we raise the question whether defendant's claim is properly before us. To preserve such a point for review on appeal, a defendant must of course provide an adequate record. (See, e.g., *People v. Romo* (1975) 14 Cal.3d 189, 195 [121 Cal.Rptr. 111, 534 P.2d 1015]; *People v. Green* (1979) 95 Cal.App.3d 991, 1001 [157 Cal.Rptr. 520]; *People v. Clifton* (1969) 270 Cal.App.2d 860, 862 [76 Cal.Rptr. 193]; cf. *Lucero v. Superior Court* (1981) 122 Cal.App.3d 484, 489 [176 Cal.Rptr. 62] [holding that to preserve a claim for review by extraordinary writ, a defendant must provide an adequate record].)

The issue arises whether the record here is adequate: in making the ruling under challenge, the court evidently considered a typewritten report prepared by Sergeant Wingo, which, inter ali, a memorialized Rauch's statement; that report, however, is not contained in the record.

After careful review, we believe the record is in fact sufficient. From the reporter's and clerk's transcripts, we have been able to determine what the relevant part of Wingo's report must have stated. To be sure, the record is not perfect. But it is indeed adequate. Our conclusion is confirmed by the evident agreement of the Attorney General, who is counsel for the People. Time and again in his briefs, he claims that a contention by defendant is procedurally barred. He makes no such claim here.

■ We turn now to the merits. As noted, defendant maintains that the court's ruling on the admissibility of Rauch's statement as a declaration against interest was erroneous. We review the court's ruling under the abuse-of-discretion standard. The Legislature evidently intended to entrust

to the trial court's sound discretion the determination of the admissibility of evidence pursuant to the declaration-against-interest exception. "The focus, indeed, the heart of this exception . . . is . . . the basic trustworthiness of the declaration." (*People* v. *Bullard* (1977) 75 Cal.App.3d 764, 769 [142 Cal.Rptr. 473].) The decision whether trustworthiness is present requires the court to apply to the peculiar facts of the individual case a broad and deep acquaintance with the ways human beings actually conduct themselves in the circumstances material under the exception. Such an endeavor allows, in fact demands, the exercise of discretion. Of course, we review the specific determinations underlying the court's ruling under the standards appropriate thereto. (See generally *People* v. *Louis, supra*, 42 Cal.3d at pp. 985-987; *Crocker National Bank* v. *City and County of San Francisco* (1989) 49 Cal.3d 881, 888 [264 Cal.Rptr. 139, 782 P.2d 278] [following *Louis*].)

Applying the abuse-of-discretion standard, we find no error in the court's ruling that Rauch's statement was admissible under the declaration-against-interest exception. The court concluded the exception was applicable. On this record, we cannot characterize that conclusion as unreasonable: the statement appears basically trustworthy.

Defendant argues to the contrary. He claims the court erred by determining that the exception's unavailability requirement was satisfied. And he does so notwithstanding the settled rule that a declarant is unavailable when, as here, he claims a privilege against self-incrimination and refuses to testify (e.g., *People* v. *Leach* (1975) 15 Cal.3d 419, 438 [124 Cal.Rptr. 752, 541 P.2d 296]), and also notwithstanding his own concession below that Rauch was in fact unavailable.

We need not address the standard of review applicable to determinations of unavailability. This is because we reject defendant's claim of error on procedural grounds.

First, as noted above defendant conceded that Rauch was in fact unavailable. He may not be heard to complain of the court's determination in conformity with his concession.

Second, in this court defendant offers only one argument: Rauch would not have claimed a privilege against self-incrimination and refused to testify if the court had not erroneously denied the prosecution's section 1324 petition. Defendant did not offer this argument below. Had he done so, he would have given the court an opportunity to consider the question and to avoid or cure the claimed error—indeed, before the ruling in question, the court had expressed a belief that it might have erred by denying the prosecution's petition. Moreover, had defendant offered the argument he would

have provided an occasion to develop a record adequate for review. But as stated, he did not offer the argument below. Accordingly, he may not do so here. (Cf. *Lorenzana* v. *Superior Court* (1973) 9 Cal.3d 626, 640 [108 Cal.Rptr. 585, 511 P.2d 33] [dealing with a motion to suppress under Pen. Code, § 1538.5].)

Defendant also claims the court erred by determining that the exception's against-interest requirement was satisfied. We are faced with the question: What is the standard of review applicable here? As we have explained, a ruling on the admissibility of evidence as a declaration against interest is broadly reviewed for abuse of discretion: the heart of the exception is the basic trustworthiness of the declaration, and that question is entrusted to the trial court's discretion. It follows that a determination whether the declaration is indeed against interest should itself be reviewed for abuse of discretion: that issue goes to the core of the question of basic trustworthiness, and hence must be deemed entrusted to the court's discretion.

 Applying the abuse-of-discretion standard, we find no error in the determination that the against-interest requirement was met. The court could have reasonably concluded that at the time it was made, Rauch's statement so far subjected him to the risk of criminal liability that a reasonable person in his position would not have made it unless he believed it to be true. This is because Rauch all but confessed that he was an accessory to the crimes committed in the Riverside K mart incident: "Every person who, after a felony has been committed, harbors, conceals or aids a principal in such felony, with the intent that said principal may avoid or escape from arrest, trial, conviction or punishment, having knowledge that said principal has committed such felony . . . , is an accessory to such felony." (Pen. Code, § 32.) To be sure, Rauch did not *expressly* admit either intent or knowledge. But he impliedly admitted both by his suspicious conduct throughout the incident in question.

Defendant argues to the contrary. He claims Rauch's statement should be considered untrustworthy in view of its substance. He says it must be characterized as neutral or exculpatory, and therefore unreliable, because it admits no more than it does. We cannot so characterize the statement. To be sure, the criminal liability that the statement risks is not the highest. But it is significant nonetheless.

Defendant next claims Rauch's statement should be considered untrustworthy in light of the circumstances under which it was made. The facts developed at the hearing are these: during questioning by the police, Rauch was advised of the seriousness of the crimes committed in the Riverside K mart incident, and was warned not to withhold information; he said he

feared prosecution if he spoke truthfully; he was told he should not if he was truthful and had taken no part at all in the crimes; he then proceeded to make the statement in question.

Defendant says the statement was made in the face of words that a reasonable person would have construed as a virtual grant of immunity or at least a promise of a benefit, and hence should be deemed unreliable. We disagree. The statement falls outside any "grant" or "promise" the words could reasonably have been understood to offer. As stated above, Rauch all but confessed that he was an accessory to the crimes committed. He thereby admitted he had taken some part in those offenses.

Defendant also says Rauch's statement was made in a situation in which a reasonable person would have been tempted to distance himself from the crimes under investigation and to curry favor with the authorities, and hence should be deemed unreliable. We acknowledge the temptation in the abstract. But we cannot conclude that Rauch yielded. It does not appear that he was involved in the Riverside K mart incident more closely than his statement implies. Hence, it does not appear that he attempted to distance himself from the event in any significant way.

In sum, under the abuse-of-discretion standard the court did not err by determining that the against-interest requirement was met. Defendant's argument shows only that a court might perhaps have been able to arrive at the conclusion that Rauch's statement did not so far subject him to the risk of criminal liability that a reasonable person in his position would not have made it unless he believed it to be true. It simply does *not* show that a court was unable to arrive at the opposite conclusion. Therefore, it does not establish an abuse of discretion.

■ But even if the court had in fact erred by ruling admissible, and subsequently admitting, Rauch's statement, reversal is not called for. It is the general rule for error under state law that reversal requires prejudice and prejudice in turn requires a reasonable probability of an effect on the outcome. (See, e.g., *People* v. *Watson* (1956) 46 Cal.2d 818, 834-837 [299 P.2d 243].) That rule is applicable here. (*People* v. *Leach, supra,* 15 Cal.3d at p. 445.)[5]

---

[5] We acknowledge that some cases contain language that may perhaps be read to imply that prejudice is presumed unless the error is shown to be harmless beyond a reasonable doubt (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065]) when the declarant is a codefendant *or* his statement is "powerfully incriminating." (See, e.g., *People* v. *Frutos* (1984) 158 Cal.App.3d 979, 987 [205 Cal.Rptr. 204].) Read thus, such language would be erroneous. It is only when the declarant is a codefendant *and* his statement is "powerfully incriminating" that such harmless-error analysis applies. This is because, as relevant here, it is only when *both* conditions are satisfied that federal con-

Having reviewed the record, we discern no prejudice that could have arisen from the claimed "error." There was strong evidence, properly admitted, linking defendant to the crimes at the Stockton K mart. Such evidence was "direct," showing his involvement in those offenses themselves. It was also "indirect," suggesting his participation in the Stockton crimes by showing his participation in those at Riverside. In its substance, albeit not in its details, Rauch's statement was cumulative to other "indirect" evidence—and defendant himself essentially conceded as much below: several witnesses gave testimony establishing that not long after the crimes at the Riverside K mart, Bernard, Michael, and defendant arrived in Hinesville under suspicious circumstances. In view of the foregoing, we conclude that there is no reasonable probability that the claimed "error" affected the outcome.[6]

### G. *Admission of Testimony by Alibi Witness on Cross-examination*

As noted in the facts (see part I.A, *ante*), defendant presented a defense of alibi: on the day of the crimes at the Stockton K mart, he was not in Stockton but rather several hundred miles away in Southern California.

Romelia Popkins testified on his behalf, as relevant here, to the following effect: she was the mother of defendant's wife and therefore his mother-in-law; she had agreed to take care of the pair's children on the day in question while they went Christmas shopping; she lived in Covina and they lived in Chino; between 2 and 3 p.m. that day defendant and his wife arrived at her home with their children; after chatting awhile, the pair left to go shopping; between 8:30 and 9:30 p.m. they returned; they stayed about 30 to 45 minutes and then went home with their children.

On cross-examination Popkins was asked by the prosecutor whether she had ever told the police that defendant was in Southern California, and not Stockton, on the day in question. She answered no. In his summation the prosecutor argued that her answer tended to show that her alibi testimony was fabricated.

---

stitutional error appears (see *Bruton* v. *United States* (1968) 391 U.S. 123, 135-136 [20 L.Ed.2d 476, 484-485, 88 S.Ct. 1620]), and that prejudice is presumed unless the error is shown to be harmless beyond a reasonable doubt (*Harrington* v. *California* (1969) 395 U.S. 250, 251-254 [23 L.Ed.2d 284, 286-287, 89 S.Ct. 1726]). (See *People* v. *Leach, supra,* 15 Cal.3d at p. 445.)

[6]Defendant claims the court's ruling was error under the United States Constitution as well as the Evidence Code. He argues that the decision violated his right of confrontation under the Sixth and Fourteenth Amendments: Rauch was not unavailable—he would not have claimed a privilege against self-incrimination and refused to testify if the court had not erroneously denied the prosecution's section 1324 petition; moreover, the statement itself was not sufficiently reliable. We reject the point: defendant failed to object on the ground that the admission of Rauch's statement would violate his federal constitutional right of confrontation.

Defendant contends that the court prejudicially erred by admitting Popkins's testimony that she never told the police that he was in Southern California, and not Stockton, on the day of the crimes at the Stockton K mart. He argues the testimony was inadmissible because it was irrelevant and also because it infringed on his privilege against self-incrimination under article I, section 15, of the California Constitution.

We reject the point at the threshold. As stated above, the rule is that a defendant may not complain on appeal that evidence was inadmissible on a certain ground if he did not make a timely and specific objection on that ground in the trial court. At trial, defendant made no objection whatever. Defendant argues the rule is not applicable here. He asserts any objection would have been futile. We disagree. Although *People* v. *Ratliff* (1987) 189 Cal.App.3d 696 [234 Cal.Rptr. 502], the case on which he places primary reliance, was decided during pendency of this appeal, the ground of irrelevancy he now urges was not inconsistent with the case law at the time of trial. Nor was the ground of privilege. Accordingly, futility does not appear. Defendant also asserts in substance that the rule is in conflict with, and must yield to, his Eighth Amendment right to a reliable penalty determination and the state's independent interest in the reliability of such a determination. Again we disagree: no significant conflict appears.

We also reject the point on the merits. Any error in admitting the challenged testimony was plainly harmless. The evidence inculpating defendant in the crimes at the Stockton K mart was quite strong, and that exculpating him was quite weak. Popkins's credibility was open to attack, and was in fact attacked, on the ground of her affinity with defendant. Her credibility would not have been marginally reduced by the attack on her alibi testimony. Therefore, there is not a reasonable probability that the "error" affected the outcome.

Next, defendant claims in effect that the prosecutor engaged in misconduct by arguing that the testimony in question tended to show that Popkins's contribution to the alibi defense was fabricated. The point is ultimately based on the argument that the testimony was both irrelevant and violative of defendant's state constitutional privilege against self-incrimination.

A defendant, however, cannot complain on appeal of misconduct by a prosecutor at trial unless he made a timely assignment of misconduct and requested that the jury be admonished to disregard the impropriety. (E.g., *People* v. *Green*, *supra*, 27 Cal.3d at pp. 27-34.) In this case defendant made no such assignment and request. It is true that the rule does not apply when the harm could not have been cured. (*Ibid.*) Such a situation, however, was not present here: any harm threatened was certainly curable.

Rehearsing the substance of arguments made above, defendant asserts that the rule does not apply when assignment and request would have been futile, and that, in any event, the rule is in conflict with, and must yield to, his Eighth Amendment right to a reliable penalty determination and the state's independent interest in the reliability of such a determination. ▮▮▮▮ But as stated, neither futility nor significant conflict appears.[7]

### H. *Prosecutorial Misconduct*

As noted in the facts (see part I.A, *ante*), Billy Ray Colbert testified for the prosecution on rebuttal about certain admissions defendant allegedly made to him in jail. The admissions in question related to the crimes at the Stockton K mart and also to the Riverside K mart incident. In the course of Colbert's testimony, the prosecutor asked the following questions and Colbert gave the following answers.

"Q. . . . Now, you indicated that you tried to get [defendant] to talk then about this thing that happened in Riverside, is that correct? A. Yes, sir.

"Q. What if anything did he say to you about it? A. . . . [¶] That it was some female witness that he had got throwed out that ID'd him on the robbery there.

"Q. Okay. A. You know, I can't remember word for word, but I do remember he said it was some woman that was suppose to have identified

---

[7] Defendant claims that trial counsel provided him with ineffective assistance under both the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 15, of the California Constitution by failing to respond to the prosecutor's attack on cross-examination and in summation.

To establish such a point, a criminal defendant must show: (1) counsel's performance was deficient, i.e., " 'counsel's representation fell below an objective standard of reasonableness . . . under prevailing professional norms' "; and (2) counsel's deficient performance subjected the defense to prejudice, i.e., " 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " (*People* v. *Ledesma* (1987) 43 Cal.3d 171, 216-218 [233 Cal.Rptr. 404, 729 P.2d 839] [discussing both federal and state constitutional rights], quoting *Strickland* v. *Washington* (1984) 466 U.S. 668, 687, 688, 694 [80 L.Ed.2d 674, 693-694, 697-698, 104 S.Ct. 2052] [discussing federal constitutional right].)

Defendant does not establish his claim. We are reluctant to hold trial counsel's performance deficient. It does not appear to have been objectively unreasonable for counsel to remain silent and thereby call no attention to the prosecutor's attack. In any event, we cannot hold any deficiency prejudicial. To be sure, in both cross-examination and summation the prosecutor vigorously challenged Popkins's credibility because of her failure to volunteer her exculpatory evidence to the police. But he even more vigorously challenged her credibility because of her affinity with defendant. Judged in light of the latter assault, the former must be deemed to have carried little if any marginal force. Hence, there is not a reasonable probability that but for counsel's claimed deficiency, the result would have been different.

him over telephone or some kind of way, and he got that throwed out through some kind of technicality in the courts.

"Q. Okay. A. Yes, sir.

"Q. Did he say anything more to you about what happened at Riverside? A. Yes. [¶] He says that it was a shoot-out, and that it was something about some blood. [¶] I just can't remember exactly what it was. It was some blood that they had found, and that he thought that he probably get convicted, or he made on this one in Riverside. [¶] He wasn't too worried about this one; that he was scared that he was going to be convicted on this one here is because they had him pretty well direct tied into shooting the person in Riverside, or something, in the store, in the parking lot inside the store, or something like that. [¶] I can't remember whether he said he shot him inside the store or in the parking lot."

▇▇▇ Defendant contends that the prosecutor engaged in prejudicial misconduct: he intentionally elicited assertedly inadmissible testimony, i.e., Colbert's apparent reference to the ruling barring Gomez's identification of defendant as a shooter in the Riverside K mart incident after her telephone conversation with Sergeant Brown (see part II.B, *ante*); but even if he did not intentionally elicit the testimony, he failed in his duty to see that Colbert did not volunteer his statements.

Again, a defendant may not complain on appeal if he did not timely make an assignment of misconduct and a request for admonition. Defendant did not do so. The "incurability" exception is inapplicable: an admonition after Colbert's first apparent reference to the ruling would have removed any potential for harm in that statement and would also have prevented Colbert's second reference.

Be that as it may, any misconduct was plainly nonprejudicial. As noted, the evidence inculpating defendant in the crimes at the Stockton K mart was quite strong, and that exculpating him was quite weak. The testimony in question related only to the Riverside K mart incident. Although it did indeed incriminate defendant in that event, and may have suggested the existence of additional evidence not presented to the jury, much else incriminated him as well. Therefore, there is not a reasonable probability that the "misconduct" affected the outcome.

I. *Denial of Jury's Requests for Defense Counsel's Summations*

Soon after commencing their deliberations, the jury requested a rereading of the summations given by defendant's trial counsel. (The arguments fill

more than 120 pages of the reporter's transcript.) The foreperson made the request in open court in the presence of the other members of the panel. The prosecutor objected: "I feel compelled to request the court not to do that. I feel that it's the evidence in the case that should be heard only, not the arguments, and statements of counsel. It's the evidence that the jury should make its decision on and I feel also that if one argument is going to be read both should be read. I don't feel either should be read." (Paragraphing omitted.) The court asked: "And does the defense have anything they wish to say?" Counsel responded: "We've never had it come up before, Your Honor." The court ruled as follows.

"None of us have had this particular request come up before, ladies and gentlemen.

"And one of my instructions to you is that the statements of counsel are not evidence, and you—

"Now any evidence that you would like to have read back, I'm inclined to agree with [the prosecutor] because as he pointed out and as the instruction points out, statements of counsel aren't evidence, and so if you're going to hear one argument you'd—it would seem to me only fair that you'd hear all of the arguments[.]

"But as [the prosecutor] said that was pretty long, probably it's best that none of them be reread.

"I'm inclined to agree with the district attorney on that, that we have to deny that request because those statements aren't evidence, and you're to deliberate on the evidence in the case, and so that any—any testimony, anything during the trial that you'd like to have reread . . . , I would be very happy to have the court reporter do it, but I think I'm going to honor that objection, because—because of that instruction that it is the law that you're really not to consider the statements of counsel, and so I hope you'll understand."

At that point, the foreperson made the following request: "Your Honor, as an alternate [sic] we had considered the possibility of being able to read the transcript of the defenses' [sic] closing argument. [¶] Would that be possible in lieu of having it read back to us?" The prosecutor made the same objection. And the court made the same ruling: "No. No, I don't think it's appropriate . . . ." The foreperson responded: "All right. We accept that." The court reiterated: "I don't think it's appropriate."

Before the jury recommenced their deliberations, at defense counsel's request the court explained a comment it had made in the course of its ruling.

"I won't take up much of your time, ladies and gentlemen.

"I wanted to make sure that I didn't mislead you . . . when I denied your request and referred to that instruction that says that statements of counsel or statements made by the attorneys during the trial are not evidence.

"I don't mean to—to imply that you are to disregard the argument[s] that were made by the attorneys at the close of the trial, and, of course, you may certainly consider the arguments that were made to you by counsel.

"However, those statements themselves are not evidence and it's for to you [*sic*] interpret the evidence and to weigh the evidence and to judge the credibility of witnesses, and to draw the inferences from the evidence that was presented and so for those reasons that's why I just felt that wasn't appropriate to emphasize one argument.

"I hope I made that clear.

". . . . . . . . . . . . . . . . .

"You certainly may consider the arguments of counsel for whatever persuasive effect they may have."

■■■ Defendant contends that the court erred when it denied the jury's requests for defense counsel's summations. He first argues the court was obligated to grant the requests by Penal Code section 1138 (hereafter section 1138): "After the jury have retired for deliberation, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called."

"Under section 1138, the trial court must satisfy requests by the jury for the rereading of testimony." (*People* v. *Ainsworth* (1988) 45 Cal.3d 984, 1020 [248 Cal.Rptr. 568, 755 P.2d 1017].) Under that same provision, it must also satisfy requests for instruction on applicable legal issues. (*People* v. *Wester* (1965) 237 Cal.App.2d 232, 238 [46 Cal.Rptr. 699]; *People* v. *Malone* (1959) 173 Cal.App.2d 234, 244 [343 P.2d 333].) But contrary to defendant's assertion, the court was simply not required by section 1138 to satisfy the jury's requests for defense counsel's summations. The statutory provision has evidently never been interpreted in a reported decision to cover statements or arguments by counsel. Nor can it reasonably be so

interpreted. The Legislature's words include only evidence and law. We find no reason to believe that it meant to embrace more.

Defendant next argues the court was obligated to grant the jury's requests for counsel's summations in order to avoid infringing on his right to the assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 15, of the California Constitution. But he fails to show—and we fail to see—how the court's ruling implicated those provisions at all. To be sure, "The right to the assistance of counsel 'was designed to assure fairness in the adversary criminal process . . . .' " (*People* v. *Bonin, supra,* 47 Cal.3d at p. 834 [impliedly speaking of both the federal and state constitutional rights].) But after review, we conclude that the fairness of the trial was not affected by the court's decision.

Finally, defendant argues the court was obligated to grant the jury's requests for defense counsel's summations in order to avoid "needlessly compromis[ing] the state's interest in an accurate and fair jury decision in capital cases." But contrary to defendant's assertion, no such harm was threatened here.

We do not doubt that a trial court's inherent authority regarding the performance of its functions includes the power to order argument by counsel to be reread to the jury or to be furnished to that body in written form. The exercise of such power must be entrusted to the court's sound discretion. As a result, review must be conducted under the deferential abuse-of-discretion standard. Under that standard, we find no error here. It appears that initially the court denied the jury's requests because it believed itself without authority to grant what they sought. But ultimately it denied the requests on the merits, in order to prevent the jurors from diverting their focus from the evidence introduced and the instructions given. In acting as it did, the court was not unreasonable. Defendant claims the court should have inquired further of the jury before it made its decision. But after review, we believe the court could reasonably have declined further inquiry.

### III. PENALTY ISSUES

Defendant makes several claims bearing on the question of penalty. As we shall explain, none establishes reversible error.

#### A. *Excusal of Prospective Jurors Because of Views on the Death Penalty*

Defendant contends that the court erred under the impartial jury guaranty of the Sixth and Fourteenth Amendments to the United States

Constitution when it excused several prospective jurors because of their views on the death penalty.

In *Witherspoon* v. *Illinois, supra*, 391 U.S. 510, the United States Supreme Court implied that a prospective juror could not be excused for cause without violating a defendant's federal constitutional right to an impartial jury unless, as relevant here, he made it "unmistakably clear" that he would "*automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case . . . ." (*Id.* at p. 522, fn. 21 [20 L.Ed.2d at p. 785], italics in original.) In *Wainwright* v. *Witt* (1985) 469 U.S. 412 [83 L.Ed.2d 841, 105 S.Ct. 844], however, the court "clarified" *Witherspoon* and declared that the proper standard was "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" (*Id.* at p. 424 [83 L.Ed.2d at pp. 851-852].)

### 1. *Excusal of Prospective Jurors Without "Civic Duty" Admonition*

During voir dire, on the prosecution's challenge the court excused several prospective jurors because of their views on the death penalty. It did not admonish any of them that he had a civic duty to sit as a juror if he could subordinate his personal views to the law and follow the instructions.

■ Defendant claims the court erred by excusing the prospective jurors without first delivering a "civic duty" admonition. He argues that such an admonition is necessary to support excusal: in its absence, the record is inadequate as a matter of law to determine whether a prospective juror's views on the death penalty would prevent or substantially impair the performance of his duties as a juror. The point must be rejected. We have previously held that a "civic duty" admonition is not necessary. (*People* v. *Hovey* (1988) 44 Cal.3d 543, 575 [244 Cal.Rptr. 121, 749 P.2d 776]; *People* v. *Miranda* (1987) 44 Cal.3d 57, 96 [241 Cal.Rptr. 594, 744 P.2d 1127]; *People* v. *Ghent* (1987) 43 Cal.3d 739, 768-769 [239 Cal.Rptr. 82, 739 P.2d 1250].) We adhere to that holding. We are simply not persuaded that such an admonition is required to assure the adequacy of the record and the propriety of any excusal based thereon.

### 2. *Excusal of Prospective Juror Elizabeth Stewart*

Among the prospective jurors whom the court excused because of their views on the death penalty was Elizabeth Stewart. The prosecutor had made a challenge and defense counsel had declared, "No objection." In excusing Stewart, the court stated: "The Court finds actual bias on the part of the juror and finds because of her con[s]cientious opinions concerning the

death penalty, she's so unalterably opposed, she could never under any circumstances vote for death."

■ Defendant claims the court erred by excusing Stewart. We disagree. The court impliedly determined that Stewart's views on the death penalty would prevent or substantially impair the performance of her duties as a juror. Such a determination necessarily follows from its finding that "she could never under any circumstances vote for death."

The court's implied determination as to the effect of Stewart's views on her performance as a juror was sound. The determination constitutes a resolution of what is essentially a question of fact or, perhaps more accurately, a mixed question that is essentially factual. (Cf. *Wainwright* v. *Witt, supra,* 469 U.S. at pp. 426-430 [83 L.Ed.2d at pp. 852-856] [on a petition for writ of habeas corpus under 28 U.S.C. § 2254, the question whether a prospective juror's views on the death penalty would prevent or substantially impair the performance of his duties as a juror is a "factual issue" subject to 28 U.S.C. § 2254(d), which requires a federal court to accord a "presumption of correctness" to state court findings on "factual issues"].) As such, it is entitled to deferential review. (*People* v. *Louis, supra,* 42 Cal.3d at pp. 985-987.) The proper standard appears to be whether the determination is supported by substantial evidence and hence is not clearly erroneous. (*Ibid.*)

That standard is met here. The court's implied determination on the effect of Stewart's views on her performance as a juror was adequately supported. In the course of extensive examination by court and counsel, with varying degrees of clarity Stewart expressed opposition to capital punishment that was virtually categorical. At the end she stated: "I'm not going to vote in any way for the death penalty." In view of the foregoing, the court's implied determination that Stewart's views would prevent or substantially impair the performance of her duties as a juror was sound.

Defendant argues to the contrary. He claims in substance that Stewart's statement did not mean what it seemed to say. We recognize that she was told by court and counsel that the law mandated death if aggravation outweighed mitigation, and that she made it plain that she was unable and unwilling to follow that "mandate." But contrary to defendant's assertion, the statement in question cannot be understood as a reference to the law and its "mandate"; it rejected the penalty of death in and of itself. Defendant also claims in substance that the court's finding was fundamentally unsound. We disagree. It was supported by Stewart's statement. And it was not undermined by any erroneous belief the court may have entertained about the law and its "mandate."

### B. *Excusal of Prospective Jurors on Peremptory Challenge Assertedly in Violation of the Sixth Amendment*

During voir dire, the prosecutor used his peremptory challenges (defendant claims) to systematically exclude all prospective jurors who expressed reservations about the death penalty but were apparently not excludable for cause on that basis. Defendant contends that by acting as he did, the prosecutor violated his right under the Sixth and Fourteenth Amendments to a jury drawn from a fair cross-section of the community.

The claim is without merit. The substance of defendant's argument was rejected in *People v. Turner* (1984) 37 Cal.3d 302 [208 Cal.Rptr. 196, 690 P.2d 669], overruled on another point in *People v. Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306]: "[W]e see no . . . constitutional infirmity in permitting peremptory challenges by both sides on the basis of specific juror attitudes on the death penalty. While a statute requiring exclusion of all jurors with any feeling against the death penalty produces a jury biased in favor of death [citation], we have no proof that a similar bias arises, on either guilt or penalty issues, when *both parties* are allowed to exercise their equal, limited numbers of peremptory challenges . . . against jurors harboring specific attitudes they reasonably believe unfavorable. [Citation.] [¶] We recognize that a jury shorn of significant community viewpoints on an issue in the case is not ideally suited to the 'purpose and functioning of a jury in a criminal trial.' [Citation.] That, however, is a result inherent in the parties' historic and important right to exclude a limited number of jurors for fear of bias." (37 Cal.3d at p. 315, italics in original.) Defendant argues that the reasoning of *Turner* is unsound, but he fails to persuade us of the merit of his position.

### C. *Admission of Riverside K mart Incident for Purposes of Penalty*[8]

Defendant contends that the court erred by admitting evidence of the Riverside K mart incident for purposes of penalty. He argues that such "other crimes" evidence is inadmissible as a matter of law under the cruel and unusual punishments clause of the Eighth Amendment and the due process clause of the Fourteenth Amendment. No objection was made below predicated on either of those constitutional grounds. In any event, the substance of defendant's argument has been rejected in *People v. Balderas* (1985) 41 Cal.3d 144, 204-205 [222 Cal.Rptr. 184, 711 P.2d 480], and succeeding cases. There is no reason to revisit the issue here.

---

[8] Defendant raises this claim in his supplemental brief. (See fn. 1, *ante.*)

#### D. *Exclusion of "Orphanage Records"*

Outside the presence of the jury, defendant moved the court to allow the introduction of certain documents. The documents were referred to below as the "orphanage records." They were prepared by various persons for various purposes, and relate to the dependency proceedings involving defendant as a child and his subsequent removal from his father's home, commitment to an orphanage, placement in foster care, and eventual return to his father's home. They were obtained by defense counsel—in their own words—"via [a] rather circuitous route": counsel received the records from an investigator for Bernard's counsel, who had received them from an institution, which had apparently received them from the orphanage. The prosecution opposed the motion.

At a hearing, defense counsel and the prosecutor disputed the question of the admissibility of the orphanage records. The prosecutor argued, inter alia, that the records could not be received because they had not been authenticated as required by the Evidence Code. Counsel conceded they had not complied with the statutory requirements. But they represented they had made a "good faith effort" to do so. The prosecutor also argued that the records could not be received because they comprised hearsay and hence were barred by the hearsay rule. Counsel conceded the records comprised hearsay. But they argued they came within the business records exception. The prosecution argued they did not.

The court denied the motion. It rested its ruling on a determination that defense counsel had not laid a sufficient foundation for introduction of the orphanage records under the business-records exception to the hearsay rule.

 Defendant contends that the court erred by denying his motion. His sole argument is in substance as follows. Regardless of whether the orphanage records were generally admissible pursuant to state law, they were admissible here, at the penalty phase of a capital trial, under the United States Constitution: they were relevant to the constitutionally material issue of background and character; and under the facts of this case, their exclusion amounted to a violation of defendant's right to a fair trial on the issue of penalty under the due process clause of the Fourteenth Amendment and also a violation of his right to a reliable determination as to that issue under the cruel and unusual punishments clause of the Eighth Amendment.

We are inclined to reject the claim of error on procedural grounds. As noted, defendant's sole argument in support is based on the asserted violation of certain federal constitutional rights. But he "offered no such

argument at [the] hearing and may not do so for the first time on appeal." (*Lorenzana* v. *Superior Court, supra,* 9 Cal.3d at p. 640 [dealing specifically with a motion to suppress under Pen. Code, § 1538.5].)

In any case, we reject the claim on the merits. We recognize the relevance of the orphanage records to the constitutionally material issue of background and character. But we are not persuaded their exclusion violated defendant's federal constitutional rights to a fair trial, and a reliable determination, as to penalty. It is true that the records, which were not admitted, portrayed deprivation and neglect shadowing defendant's early life. But evidence that *was* admitted presented substantially the same theme. Defendant argues that the records were constitutionally admissible under what the plurality in *People* v. *Harris* (1984) 36 Cal.3d 36 [201 Cal.Rptr. 782, 679 P.2d 433] called the "rule" of *Green* v. *Georgia* (1979) 442 U.S. 95 [60 L.Ed.2d 738, 99 S.Ct. 2150] (*per curiam*): "in the punishment phase of a capital case, a defendant's proffered evidence must be admitted if it is highly relevant and substantial reasons exist to assume its reliability, despite the fact that the evidence is inadmissible hearsay under state law" (*People* v. *Harris, supra,* at p. 70). We shall assume for argument's sake only that the records were in fact highly relevant. But on this record we simply cannot conclude that substantial reasons existed to assume their reliability.

E. *Exclusion of Evidence on the Execution of the Death Penalty*

Outside the presence of the jury, defendant moved the court to allow introduction of evidence explaining how capital punishment is carried out. The court denied the request on the ground that the evidence was irrelevant to any material issue.

Defendant contends that the court's ruling was error. As stated, the standard of review for decisions as to whether or not certain evidence is relevant is abuse of discretion. Under that standard, no error appears: the court had no authority to arrive at a different decision.

As a matter of law, evidence explaining how capital punishment is carried out is not relevant to any issue material to the choice of penalty and as such is inadmissible. (E.g., *People* v. *Grant* (1988) 45 Cal.3d 829, 860 [248 Cal.Rptr. 444, 755 P.2d 894]; *People* v. *Harris* (1981) 28 Cal.3d 935, 962 [171 Cal.Rptr. 679, 623 P.2d 240] (plur. opn.) [decided under relevantly similar 1977 death penalty law, Stats. 1977, ch. 316, § 4 et seq., p. 1256 et seq.].) Such evidence has "no bearing on the character or record of the individual offender or the circumstances of his particular offense, which are the proper focus of a penalty trial under *Woodson* v. *North Carolina* (1976) 428 U.S. 280, 304 [49 L.Ed.2d 944, 961, 96 S.Ct. 2978]. A vivid account of

an execution has no place at the penalty phase. Unlike mitigating evidence of a defendant's background and character, which may be introduced to elicit the sympathy or pity of the jury, accounts of the executions of others do not aid the jury in making an *individualized* assessment of the crucial issue whether the death penalty is appropriate for the particular defendant on trial." (*People v. Grant, supra*, 45 Cal.3d at p. 860, italics in original.) Defendant claims the proffered evidence was relevant under both state statutory and federal constitutional law. The point merely rehearses arguments raised and rejected in the past, and need not be reconsidered yet again.

### F. *Prosecutorial Misconduct*

Defendant contends that the prosecutor engaged in misconduct in the course of his summation. At no time relevant here did he make an assignment of misconduct or request an admonition.

Defendant first complains of the following comment by the prosecutor: "Not only did the defendant take William Wiley's life and his entire future and destroy his family, he now wants to take sympathy away from him too. The sympathy that is rightfully due William Wiley."

Defendant claims that insofar as the remark referred to sympathy for the victim and the effect of the crime on his family, it was improper under *People v. Boyd* (1985) 38 Cal.3d 762 [215 Cal.Rptr. 1, 700 P.2d 782], and also under *South Carolina v. Gathers* (1989) 490 U.S. 805 [104 L.Ed.2d 876, 109 S.Ct. 2207], and *Booth v. Maryland* (1987) 482 U.S. 496 [96 L.Ed.2d 440, 107 S.Ct. 2529].

It is of course the rule that a defendant cannot complain on appeal of misconduct at trial unless in a timely fashion he made an assignment of misconduct and a request for admonition. As noted, defendant made no assignment or request. The rule, however, does not apply when, as here, the authority supporting the complaint postdates the conduct complained of. (See *People v. Lucero* (1988) 44 Cal.3d 1006, 1031, fn. 15 [245 Cal.Rptr. 185, 750 P.2d 1342]; *People v. Lewis, ante,* 262, 295, fn. 1 [266 Cal.Rptr. 834, 786 P.2d 892] (conc. & dis. opn. of Mosk, J.).)

We turn to the merits. The first question is, was the comment quoted above improper? As will appear, the answer is yes.

In *People v. Boyd, supra*, 38 Cal.3d 762, 772-776, we made it plain that the only circumstances material to the determination of penalty are those defined in Penal Code section 190.3 (hereafter section 190.3). In the general

case—and certainly here—the effect of the crime on the victim's family is not relevant to any material circumstance. Nor is sympathy for the victim. Obviously, evidence on these matters is inadmissible. Just as obviously, argument on them is barred. It is manifest that the remark was improper under *Boyd* in these respects.

In *South Carolina* v. *Gathers, supra*, 490 U.S. 805, __-__ [104 L.Ed.2d 876, 882-883, 109 S.Ct. 2207, 2210-2211], the United States Supreme Court concluded that it was generally violative of a criminal defendant's rights under the Eighth Amendment to present argument concerning such matters as the victim's personal characteristics, the emotional impact of the crime on his family, and the opinions of family members about the crime and the criminal. The court followed *Booth* v. *Maryland, supra*, 482 U.S. 496, 502-509 [96 L.Ed.2d 440, 448-452], in which it had concluded that it is generally violative of those same rights to introduce evidence relating to such matters. It is manifest that the remark was improper under *Gathers* and *Booth* insofar as it related to the effect of the crime on the victim's family.

The next question is, does the impropriety require reversal? As will appear, the answer is no.

In *Rose* v. *Clark* (1986) 478 U.S. 570, 576-577 [92 L.Ed.2d 460, 469-470, 106 S.Ct. 3101], the United States Supreme Court declared the following general rule: federal constitutional error is not automatically reversible, but is subject to harmless-error analysis under the beyond-a-reasonable-doubt test of *Chapman* v. *California, supra*, 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711]. This rule operates in the penalty phase of a capital proceeding. (See *Satterwhite* v. *Texas* (1988) 486 U.S. 249, 257-258 [100 L.Ed.2d 284, 294-295, 108 S.Ct. 1792].) And it applies to the federal constitutional violation here. (*People* v. *Lewis, supra, ante*, at p. 285.)

In *People* v. *Brown* (1988) 46 Cal.3d 432 [250 Cal.Rptr. 604, 758 P.2d 1135], we declared the following general rule: error in the penalty phase of a capital trial that is not of federal constitutional dimension is not automatically reversible, but is subject to harmless-error analysis under the reasonable-possibility test. (See *id.* at pp. 446-448; *id.* at pp. 463-470 (conc. opn. of Mosk, J.).) This rule, we now hold, applies to the state statutory violation here.

Under *Chapman* and *Brown*, the impropriety here was nonprejudicial. The objectionable remark was relatively brief and unemphatic, and was of minimal significance within the penalty phase as a whole. Hence, we conclude that there is no reasonable possibility that the impropriety affected

the outcome, and are of the opinion that it was harmless beyond a reasonable doubt.

■ Defendant next complains of the following comments by the prosecutor. At one point, after summarizing certain evidence presented by defendant concerning life in prison, the prosecutor said: "And that's what you have to weigh here? What is the victim left with? Remember him, William Wiley? What is he left with? What makes it fair? What is there to weigh on his side? Is the defendant really punished by going to state prison? Can we really go out to the community, if the defendant is placed in prison for the rest of his life, and say that, well, the defendant got what he deserved?" (Paragraphing omitted.)

At another point, the prosecutor said: "There is nothing [in a verdict of life imprisonment without possibility of parole] that you can go to the community and say our laws work, there is justice."

At yet another point, as he was concluding his summation, the prosecutor said:

"There is a very thin line that divides a society like ours from the dark side, and that thin line is the laws that we have erected and the government that we have that we subscribe to to protect us.

"And society must believe in the justice of our decisions. That really is the only thing that protects us from the dark side, and we see that, we see that all the time, as you undoubtedly saw in the news recently something that's getting a lot of publicity is the case of Bern[h]ard Goetz in New York, the fellow that murdered or tried to murder four young men in a subway, in an act of vigilantism, and the reason he did that undoubtedly, and the reason there is so much talk about vigilantism is because that's what society turns to when it no longer believes that its laws provide justice[.]

"And in this case no matter what you do, I want you to be able to face the community and say for yourselves, 'Yes, we feel sorry for him, we felt merciful, but we balanced, we balanced the factors, and our decision was a true balance based upon the facts in the case.'

"And I really don't think that you can face the community or anybody else and say honestly with sincerity that in this case, whatever the defendant's background was, it equalled the ruthlessness and the cruelty of what he did not once, but twice, and whatever your decision is, please make sure that you feel in your own hearts that you have properly struck that balance.

"It's important to all of us, not just the defendant but all the people."

Defendant claims that in the comments quoted above, the prosecutor made a blatantly emotional appeal to the jurors' passions and prejudices, and told them they were required to return a verdict of death because society demanded the ultimate sanction and their civic duty bound them to satisfy that demand.

We would reject the point on procedural grounds. As stated, it is the rule that a defendant cannot complain of misconduct unless he made an assignment of misconduct and a request for admonition—a condition not satisfied here. Defendant argues the rule should not be allowed to operate at the penalty phase of a capital case. In *People* v. *Miranda, supra,* 44 Cal.3d 57, 108, footnote 30, we rejected the same argument. Defendant asserts that *Miranda* is unsound on this point: procedural rules, he says, must yield when a man's life is at stake. He is not persuasive. (Cf. *Smith* v. *Murray* (1986) 477 U.S. 527, 538 [91 L.Ed.2d 434, 106 S.Ct. 2661] [rejecting "the suggestion that the principles of" *Wainwright* v. *Sykes* (1977) 433 U.S. 72 [53 L.Ed.2d 594, 446, 97 S.Ct. 2497], which generally bar federal habeas corpus review of federal constitutional claims defaulted under state procedural rules, "apply differently depending on the nature of the penalty a State imposes for the violation of its criminal laws"].)

In any event, we reject the point on the merits. We do not discern in the prosecutor's comments what defendant asserts he has discovered therein. More important, we do not believe that the jurors could have understood the remarks as defendant claims they would have. To be sure, in his comments the prosecutor argued vigorously and movingly that death was the only just and appropriate punishment for defendant under the facts of the case. But we find nothing improper in the tone of the words or their content.

Defendant also complains of the following comment by the prosecutor: "And as the evidence in this case shows that the defendants themselves, or the defense counsel themselves put on the evidence from the California State Prisons [to] show that if this particular defendant is of a character, for whatever reason, that he insists on killing to achieve whatever his goals are, there is no way that he can be stopped in prison either, because of the numerous assaults that are committed by prisoners with prison made weapons, weapons obtained inside the prison and made in the prison if somebody wants to do it, and this defendant is of such a particular character that nothing seems to stop him."

Defendant claims that in the comment quoted above, the prosecutor engaged in impropriety under *People* v. *Boyd, supra,* 38 Cal.3d 762: he

referred to the issue of future dangerousness; the circumstances material to the determination of penalty are those defined in section 190.3; those circumstances, however, do not include future dangerousness.

But as noted, defendant made no assignment of misconduct or request for admonition.[9] Be that as it may, the circumstances material to penalty include anything that the defendant proffers as a basis for a sentence less than death. (*People* v. *Boyd, supra*, 38 Cal.3d at pp. 775-776.) To support a verdict of life imprisonment without possibility of parole, defendant called witnesses who gave testimony concerning the life he would live in prison and suggesting that he would not be dangerous there. On cross-examination, the prosecutor elicited testimony concerning violence in prison and suggesting future dangerousness on defendant's part. The prosecutor's cross-examination was proper: he could seek to disprove what defendant had sought to prove. (Cf. *id*. at p. 776 [holding that "[o]nce the defense has presented evidence of circumstances admissible [as a basis for a sentence less than death] . . . prosecution rebuttal evidence would be admissible as evidence tending to 'disprove any disputed fact that is of consequence to the determination of the action[ ]' "].) Also proper therefore was the remark under challenge here: it was squarely based on the evidence.

Defendant argues to the contrary: there was no evidence supporting an inference that he would be dangerous in prison. Such an inference, however, is indeed supported by the circumstances of the crimes at the Stockton and Riverside K mart stores—which reveal defendant as the kind of man who determines his course and afterwards will brook no interference.

---

[9] Outside the presence of the jury, defendant moved the court *in limine* to restrict the prosecutor's summation in what he called the "fine line area" of "future criminality." After hearing both defense counsel and the prosecutor, the court denied the motion essentially on the ground that it was premature and ill-defined. It stated: "Well, [defense counsel], I think you've stated your position very clearly, and so has [the prosecutor], it still winds up being a fine line, and it's—difficult for the court to make some kind of ruling in advance. Your objection, and your position is noted, and certainly I'm sure you'll object if you feel the argument gets out of hand. It seems to me that this particular defendant's character and background and the appropriate punishment for this particular defendant is the issue, and the evidence we are—we are talking about the evidence that was presented in this particular case, and that the district attorney may comment on that evidence and all the reasonable inferences that maybe [*sic*] drawn from it. Now, you're talking reasonable inferences, and I can't say in advance what my ruling would be on an objection at a particular phase of the argument. So I guess we'll just have to have the arguments and note your objection of course, and a higher court will interpret, I'm sure, the arguments." (Paragraphing omitted.)

Defendant maintains that his motion was sufficient to preserve his claim of prosecutorial misconduct based on the comment quoted above. We might be inclined to agree if the motion had accomplished what a timely assignment of misconduct and request for admonition are intended to accomplish, viz., to give the trial court an opportunity to prevent or cure any harm threatened by the complained-of act or omission (*People* v. *Green, supra,* 27 Cal.3d at p. 27). The motion did not do so. As the court soundly determined, it was premature and ill-defined. Hence, it did not give the court an adequate opportunity to prevent or cure the harm allegedly threatened by the claimed misconduct.

■ Finally, defendant complains of certain comments by the prosecutor about his record in the Marine Corps.[10] The prosecutor acknowledged that his record was "good," indeed "impeccable." He then proceeded as follows.

"If he had continued with his military career, he undoubtedly would have wound up like Dennis Rauch, who is apparently a high ranking noncommissioned officer in the military.

"And like a lot of other people that we know, spend twenty years in the military, achieve an honorable career, and retired [*sic*] with a nice income.

"The defendant had that choice in 1980.

"He could have stayed in the military.

"He could have succeeded in the military.

"He had everything going for him in the military.

"He could have chosen that honorable career and retired in twenty years or more with a record that would be a credit to him and to the community.

"He was not a wastrel, he was not a drug addict, he was not somebody that had no other choice, had nothing going for him.

"He had a fine military record, and what did he choose of his own free will to do?

"He choose [*sic*] to leave the Marine Corps, went to live in Arizona for a few months with his father again, did some part-time work for his father in the security business and his stepmother, and worked for another security business for a while, and then went—moved to California.

"Up to early 1982 he worked for the rotor rooter service and never worked again.

"This was a man that had free choice.

"He could choose.

"He had all the ability to choose.

---

[10] Defendant raises this complaint in his supplemental brief. (See fn. 1, *ante*.)

"It was not a person that was prevented by the circumstances, by some natural handicap or some handicap imposed upon him by the state or some place or the society, he had the ability to choose and he made the choice.

"And his choice was to live by killing.

"In 1982 after he killed Mark Freed, there is no doubt that he could have reenlisted in the Marine Corps with his record.

"He could have at that point decided [']This is not for me. [¶] I see the error of my ways, not only have I killed a man, but I almost was killed myself.[']

"At that point he could have said, [']I'm going back to the Marine Corps, I'm going to leave it, I'm going to abandon these activities.[']

"But he choose [sic] of his own free will not to.

"And that's basically what we are here to decide, What should be the consequences of a person like this who can choose and who chooses evil?

"What should be that penalty?

"Is there anything—anything on the other side that mitigates what he did or lessens in any way that choice?"

Defendant claims that in the comments quoted above, the prosecutor engaged in misconduct: it is improper for a prosecutor to argue that evidence that is mitigating is in fact aggravating (*People* v. *Edelbacher* (1989) 47 Cal.3d 983, 1033 [254 Cal.Rptr. 586, 766 P.2d 1] (lead opn. by Kaufman, J.); character and background evidence proffered by a defendant as a basis for a sentence less than death can only be mitigating (*ibid.*); defendant proffered his Marine Corps record as a basis for life imprisonment without possibility of parole; but the prosecutor argued that that evidence was in fact aggravating.

As noted, defendant made no assignment of misconduct or request for admonition. In any event, we find no impropriety in the prosecutor's comments. He simply did not argue—and certainly would not have been heard by the jury to argue—that defendant's Marine Corps record was aggravating. The gist of his remarks was to the following effect: "Defendant had the ability to make a choice between good and evil. And he chose evil." Such an argument, which is squarely based on the record, is not objectionable. Defendant claims that the prosecutor's comments violated his rights under

the Fifth, Eighth, and Fourteenth Amendments. His premise is that the prosecutor improperly argued that his Marine Corps record, which could only be mitigating, was in fact aggravating. But as explained above, that premise is unsupported.[11]

G. *Failure to Instruct on Unanimity as to Other Crimes*[12]

■ Defendant contends that the court erred by failing to instruct the jurors sua sponte that they could not consider the "other crimes" evidence relating to the Riverside K mart incident unless they *unanimously* agreed that such other crimes had been proved beyond a reasonable doubt. But in *People* v. *Miranda, supra,* 44 Cal.3d 57, 99, we held that unanimity is not required by state law. Defendant claims that unanimity *is* required by the cruel and unusual punishments clause of the Eighth Amendment and the due process clause of the Fourteenth Amendment, but he fails to persuade us of the merit of his point.

H. *Failure and Refusal to Instruct on the Burden of Proof Beyond a Reasonable Doubt as to Aggravating Circumstances*

Defendant contends in substance that the court erred by failing or refusing to instruct the jurors to the following effect: (1) they could consider a circumstance in aggravation only if they were satisfied of its existence beyond a reasonable doubt; (2) they could fix the penalty at death only if they found that the aggravating circumstances outweighed the mitigating beyond a reasonable doubt; and (3) they could so fix the penalty only if they determined that death was appropriate beyond a reasonable doubt. (He had requested instruction on the first point, but not on the second or third.)

Defendant rests his claim on the assertion that the due process clause of the Fourteenth Amendment to the United States Constitution and article I, sections 7 and 15, of the California Constitution require imposition on the prosecution of the burden of proof beyond a reasonable doubt as to each of the issues identified above.

We need not address the question of the proper standard of review. The reason is plain: the assertion on which defendant rests his claim is unsup-

---

[11] Defendant broadly claims that the complained-of "misconduct" by the prosecutor violated various of his rights under the United States and California Constitutions, and thereby rendered the penalty phase fundamentally unfair and its outcome necessarily unreliable. But except as determined above, the prosecutor's conduct implicated none of defendant's constitutional rights, and certainly did not undermine the process of determining penalty or taint its result. Defendant also broadly claims that the "misconduct" was inflammatory. The record, however, does not support the characterization.

[12] Defendant raises this claim in his supplemental brief. (See fn. 1, *ante.*)

ported (e.g., *People* v. *Marshall, ante,* 907, 936 [269 Cal.Rptr. 269, 790 P.2d 676] [holding that neither the due process nor cruel and unusual punishments clauses of either the federal or state Constitution impose such a burden]; *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 777-779 [230 Cal.Rptr. 667, 726 P.2d 113] [same]).

## I. *Refusal of Certain Instructions Requested by Defendant*

Defendant contends that the court erred when it refused to give certain instructions he had requested.

### 1. *Prohibition Against Considering Extraneous Aggravating Factors*

The court instructed the jurors on the factors they were to consider in determining penalty as follows.

"In determining which penalty is to be imposed on defendant, you shall consider all of the evidence which has been received during any part of the trial of this case. You shall consider, take into account and be guided by the following factors, if applicable:

"(a) The circumstances of the crimes in Stockton of which the defendant was convicted in the present proceeding and the existence of any special circumstance found to be true.

"(b) The presence or absence of any prior criminal acts by the defendant in Riverside which involved the use or attempted use of force or violence.

"(c) The presence or absence of any prior criminal conviction.

"(d) The age of the defendant at the time of the crime.

"(e) Whether or not the defendant was an aider and abettor in the present offenses and his participation in the commission of the offenses was relatively minor.

"(f) Any other circumstance which mitigates the gravity of the crime even though it is not a legal excuse for the crime.

"(g) Any aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death."[13]

---

[13] We quote the instruction as it appears on the written form evidently sent into the jury room for deliberations and recorded in the clerk's transcript, and not the instruction as it was

Defendant requested the court to deliver the following instruction after the list of penalty factors: "I have just read to you the ONLY aggravating factors that the law permits you to consider if you find them established by the evidence. You may not take into account any other facts or circumstances as the basis for deciding that the death penalty would be an appropriate punishment in this case." (Capitalization in original.) The court refused on the ground the proposed instruction was "confusing."

■■ It is of course virtually axiomatic that a court may give only such instructions as are correct statements of the law. (See *People* v. *Anderson* (1966) 64 Cal.2d 633, 641 [51 Cal.Rptr. 238, 414 P.2d 366] [holding that "the law requires . . . that the trial court correctly instruct on . . . points of law"].) Accordingly, a court may refuse an instruction that is incorrect. (See *People* v. *Thompson* (1988) 45 Cal.3d 86, 129-131, 134-135 [246 Cal.Rptr. 245, 753 P.2d 37].) It may also refuse an instruction that is confusing. (*People* v. *Hendricks* (1988) 44 Cal.3d 635, 643 [244 Cal.Rptr. 181, 749 P.2d 836].)

Defendant claims the court erred by refusing the instruction requested. As noted, the court determined the instruction was confusing. Such a determination is subject to review under the abuse-of-discretion standard: the relevant inquiry looks to how the individual jurors in the particular trial might understand the instruction in question, and therefore requires the exercise of discretion. Under that standard, no error appears. In our view, the court could have reasonably concluded that the instruction requested by defendant was indeed confusing. In any event, the instruction was incorrect. To be sure, the law permits the jury to consider only penalty factors (a) through (j) of section 190.3, and evidence relevant thereto, in determining aggravation. (*People* v. *Boyd, supra,* 38 Cal.3d at pp. 772-776.) But the factors set out in the list the court delivered omitted statutory factors (d) through (h). Therefore, the requested instruction was incorrect in stating that the court's list set out the only factors the law permitted the jury to consider.[14]

But even if the court had in fact erred, no prejudice would have arisen. The jurors would have understood the instruction quoted above to allow them to consider the listed penalty factors, "if applicable," and to prohibit them from considering others. Contrary to defendant's assertion, nothing in

orally delivered and recorded in the reporter's transcript. The versions, however, are virtually identical and differ in no way relevant here.

[14]Of course, on request a court must give an instruction stating that the jury may consider only penalty factors (a) through (j), and evidence relevant thereto, in determining aggravation. (See *People* v. *Williams* (1988) 45 Cal.3d 1268, 1324 [248 Cal.Rptr. 834, 756 P.2d 221].) But as explained above, the instruction in question was not such.

the record would have prevented the jurors from arriving at such an understanding. It is true that in his summation the prosecutor made a comment referring to sympathy for the victim and the effect of the crime on his family. (See part III.F, *ante*.) But that remark was relatively brief and unemphatic, and was of minimal significance within the penalty phase as a whole. (*Ibid*.) Certainly, it could not have undermined the force of the court's instruction. Therefore, it is not reasonably possible that the asserted error affected the outcome.

### 2. *Consideration of Certain Circumstances in Mitigation*

Defendant requested the court to instruct the jury, in relevant part, as follows.

"You may consider as mitigating factors: [¶] THAT THE DEFENDANT IS A FATHER, [¶] HIS POTENTIAL FOR REHABILITATION AND FOR CONTRIBUTING AFFIRMATIVELY TO THE LIVES OF HIS FAMILY AND FRIENDS, AND HIS BACKGROUND, INCLUDING BUT NOT LIMITED TO: [¶] HIS AGE, [¶] HIS LACK OF A CRIMINAL RECORD, [¶] HIS INSTITUTIONALIZATION AT AN EARLY AGE WHEN ABANDONED BY HIS PARENTS, [¶] HIS MILITARY SERVICE RECORD[,] [¶] HIS CHARACTER, BACKGROUND, HISTORY, PHYSICAL CONDITION, [¶] AND HOW WELL HE WILL ADJUST WHEN IN A PRISON INSTITUTION." (Capitalization in original.) The court refused on the ground the proposed instruction was argumentative.

Defendant claims the court erred by refusing the instruction requested. ■■■■ A court may—and, indeed, must—refuse an instruction that is argumentative, i.e., of such a character as to invite the jury to draw inferences favorable to one of the parties from specified items of evidence. (*People* v. *Wright* (1988) 45 Cal.3d 1126, 1135-1138 [248 Cal.Rptr. 600, 755 P.2d 1049].) As noted, the court determined the instruction was in fact argumentative. We need not resolve the question of the appropriate standard of review. Under any standard, the court's conclusion was plainly sound. (Compare *People* v. *Williams, supra*, 45 Cal.3d at pp. 1323-1324 [holding proper a court's refusal of a similar instruction on the same ground].)

Defendant claims the court did indeed err by refusing the requested instruction. He argues he was entitled to the instruction under *People* v. *Sears* (1970) 2 Cal.3d 180, 189-190 [84 Cal.Rptr. 711, 465 P.2d 847]. He is wrong. Under *Sears* he had a "right to an instruction that 'pinpoint[s] the *theory* of the defense.'" (*People* v. *Wright, supra*, 45 Cal.3d at p. 1137, italics added.) The instruction in question did not do so. (Compare *People* v.

*Howard* (1988) 44 Cal.3d 375, 442 [243 Cal.Rptr. 842, 749 P.2d 279] [holding proper a court's refusal of a similar instruction on the same ground].)

Defendant also argues he was entitled to the instruction under *Lockett* v. *Ohio* (1978) 438 U.S. 586 [57 L.Ed.2d 973, 98 S.Ct. 2954], and its progeny. Again he is wrong. Under those cases he had a right to "clear instructions which not only do not preclude consideration of mitigating factors [citation], but which also 'guid[e] and focu[s] the jury's objective consideration of the particularized circumstances of the individual offense and the individual offender . . .' [citation]." (*Spivey* v. *Zant* (5th Cir. 1981) 661 F.2d 464, 471.) He received such instructions. But under those cases he did not have a right to an instruction—like the one requested—that invites the jury to draw favorable inferences from the evidence. (See *People* v. *Howard, supra*, 44 Cal.3d at pp. 442-443.)[15]

3. *Definition of "Life Imprisonment Without Possibility of Parole"*

 Defendant requested the court to instruct the jury as follows: "A sentence of life without possibility of parole means that the Defendant will remain in state prison for the rest of his life and will not be paroled at any time." The court refused.

Defendant claims the court erred. We disagree. As stated above, a court may refuse an instruction that is incorrect. The instruction in question is such: "It is . . . incorrect to tell the jury the penalty of . . . life without possibility of parole will inexorably be carried out" (*People* v. *Thompson, supra*, 45 Cal.3d at p. 130). Defendant argues the court should have given the instruction because one of the prospective jurors—who was subsequently excused for cause—apparently entertained the belief that the sentence of life imprisonment without possibility of parole does not mean life imprisonment *without possibility of parole.* The fact remains, however, that the instruction requested was incorrect. Hence, it was properly refused. (See *People* v. *Thompson, supra*, at p. 131.) What the court should have done had the jury raised the issue of the meaning of "life imprisonment without possibility of parole" need not be addressed here. The jury did not raise the issue. (See *People* v. *Ramos* (1984) 37 Cal.3d 136, 159, fn. 12 [207 Cal.Rptr.

---

[15]Defendant claims that by refusing the instruction in question, the court committed error of federal constitutional dimension requiring vacation of the verdict of death: the court created an imbalance of forces between the accused and his accuser offensive to the due process clause of the Fourteenth Amendment when it assertedly gave "pinpoint" instructions to the prosecution and denied similar instructions to the defense. We cannot agree. There was no imbalance attributable to "pinpoint" instructions: no such instructions were given.

800, 689 P.2d 430] [dealing with whether and when a court should instruct on the possibility of commutation].)[16]

### J. *"Cumulative" Prejudice*

Defendant contends in substance that when they are considered together, the errors in this case require reversal. But "Even when his life is at stake, ' "[a] defendant is entitled to a fair trial but not a perfect one." ' " (*People* v. *Williams, supra,* 45 Cal.3d at p. 1333.) From our review of the record, we are convinced that defendant did indeed receive a fair trial.

### K. *Constitutionality of the 1978 Death Penalty Law*

Defendant contends that the 1978 death penalty law is violative of the cruel and unusual punishments clause of the Eighth Amendment and the due process clause of the Fourteenth Amendment. His argument merely rehearses that made by the defendant in *People* v. *Rodriguez, supra,* 42 Cal.3d at page 777. We rejected the argument there. (*Id.* at pp. 777-779.) We reject it here as well.

Defendant separately contends that the 1978 death penalty law is violative of the due process clauses of the Fifth and Fourteenth Amendments, the impartial jury clause of the Sixth Amendment, and the cruel and unusual punishments clause of the Eighth Amendment, because it does not prohibit the jurors from considering "other crimes" evidence unless they agree *unanimously* that such other crimes have been proved beyond a reasonable doubt.[17] We are simply unpersuaded of the merit of defendant's claim. ██ In our view, the constitutional provisions relied on do not require unanimity, separately or together.[18]

---

[16] Defendant claims that by refusing the three instructions identified above, the court committed error of federal constitutional dimension requiring vacation of the verdict of death: by its refusal, the court effectively precluded the jury from considering relevant mitigating evidence and thereby violated defendant's Fourteenth Amendment right to a fair trial as to penalty and his Eighth Amendment right to a reliable determination on that issue. The point is without merit. The instructions actually given allowed, indeed directed, the jurors to consider all relevant mitigating evidence when they told them to take into account "Any . . . circumstance which mitigates the gravity of the crime even though it is not a legal excuse for the crime" and "Any aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death." The refusal of defendant's requested instructions did not, and could not, nullify or undermine that directive.

[17] Defendant raises this claim in his supplemental brief. (See fn. 1, *ante.*)

[18] Having reviewed the record in its entirety, we are of the opinion that the jury found that defendant intended to kill William Camp Wiley within the meaning of *Enmund* v. *Florida* (1982) 458 U.S. 782, 788-801 [73 L.Ed.2d 1140, 1145-1154, 102 S.Ct. 3368]: given a reasonable reading, its finding of true as to the felony-murder-robbery special-circumstance allegation necessarily establishes as much. We are also of the opinion that this finding is amply

## IV. Disposition

For the foregoing reasons, we conclude that the judgment must be affirmed.

It is so ordered.

Lucas, C. J., Broussard, J., Panelli, J., Eagleson, J., and Arabian, J., concurred.

KENNARD, J.—I concur in the majority opinion in all respects except in its conclusion that Dennis Rauch's out-of-court statement was properly admitted under the hearsay exception for declarations against penal interest (Evid. Code, § 1230). Because a reasonable person in Rauch's position could have believed that making the statement would be *in*, rather than against, his own interests, I would hold that the trial court abused its discretion in admitting the evidence. Because I agree with the majority that defendant suffered no prejudice by the statement's admission, however, I concur in the affirmance of the judgment.

The pertinent facts are not in dispute. Sergeant Wingo interviewed Rauch for four to five hours. The interview took place at the military base where Rauch was stationed. At the beginning of the interview, Rauch said that defendant and his brothers had come to stay at Rauch's home in Georgia shortly before Thanksgiving and that defendant had not been injured when he arrived but was injured subsequently. Wingo said he did not believe that defendant had arrived uninjured. Wingo described the Riverside robbery, during which a guard was killed, and warned Rauch that if he had assisted in any away he could be at risk. Wingo gave Rauch this assurance: "If you had no involvement in the robbery, and you are truthful about what happened after it, you have no fear of prosecution." Rauch then said that defendant had been injured when he arrived at Rauch's house.

Evidence Code section 1230 provides that an out-of-court statement, to be admissible under the hearsay exception for declarations against penal interest, must have "so far subjected [the declarant] to the risk of . . . criminal liability . . . that a reasonable man in [the declarant's] position would not have made the statement unless he believed it to be true." Because the Federal Rules of Evidence contain a similar provision,[1] the deci-

---

supported and adopt it as our own. Accordingly, we hold that imposition of the penalty of death on defendant does not violate the Eighth Amendment. (See *Cabana* v. *Bullock* (1986) 474 U.S. 376, 386 [88 L.Ed.2d 704, 716-717, 106 S.Ct. 689].)

[1] "The following are not excluded by the hearsay rule if the declarant is unavailable as a witness: . . . [¶] (3) A statement which . . . so far tended to subject the declarant to . . .

sions of federal courts may be consulted as persuasive authority in interpreting and applying our state rule. (See *In re Joyner* (1989) 48 Cal.3d 487, 492 [256 Cal.Rptr. 785, 769 P.2d 967].) Accordingly, federal cases are cited freely in the following analysis.

To determine whether a statement offered as a declaration against penal interest was so far contrary to the declarant's penal interest when made that a reasonable person would not have made the declaration unless it were true, it is not enough to ask whether the statement is incriminatory on its face. What is required, rather, is "a sensitive analysis of the circumstances in which the statement was made and the precise nature of the statement." (*United States* v. *Palumbo* (3d Cir. 1981) 639 F.2d 123, 127.) A number of factors have been identified as relevant to this analysis. For example, a statement made spontaneously to a close friend is more likely to be trustworthy than a statement elicited under police questioning. (*United States* v. *Rasmussen* (8th Cir. 1986) 790 F.2d 55, 56; *United States* v. *Sarmiento-Perez* (5th Cir. 1981) 633 F.2d 1092, 1102; *United States* v. *Gonzalez* (5th Cir. 1977) 559 F.2d 1271, 1273.) Here, Rauch's statement to Sergeant Wingo was not spontaneous; it was the product of prolonged interrogation.

Another important factor is whether the statements "solidly inculpate the declarant" in a serious offense. (*United States* v. *Monaco* (9th Cir. 1984) 735 F.2d 1173, 1176; see also, *United States* v. *Poland* (9th Cir. 1981) 659 F.2d 884, 895; Comment, *Federal Rule of Evidence 804(b)(3) and Inculpatory Statements Against Penal Interest* (1978) 66 Cal.L.Rev. 1189, 1214.) Rauch's statement to Sergeant Wingo incriminated him at most in being an accessory to a felony (Pen. Code, § 32),[2] and even as to that crime, which requires specific intent (*People* v. *Coleman* (1975) 13 Cal.3d 867, 877, fn. 9 [120 Cal.Rptr. 384, 533 P.2d 1024]; *People* v. *Duty* (1969) 269 Cal.App.2d 97, 100-101 [74 Cal.Rptr. 606]), Rauch did not admit either that he knew defendant had committed a felony or that he acted with the specific intent to assist defendant. Moreover, the acts that Rauch admitted performing, such as providing defendant with a place to stay and treating his wounds, were not inherently criminal.

The most significant requirement for admissibility as a declaration against penal interest is that the statement be made under circumstances in

criminal liability . . . that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. . . ." (Fed. Rules Evid., rule 804(b)(3), 28 U.S.C.)

[2] "Every person who, after a felony has been committed, harbors, conceals or aids a principal in such felony, with the intent that said principal may avoid or escape from arrest, trial, conviction or punishment, having knowledge that said principal has committed such felony or has been charged with such felony or convicted thereof, is an accessory to such felony." (Pen. Code, § 32.)

which there exists an actual and appreciable risk of serious penal consequences. The rule admitting self-incriminatory statements "rests on the assumption that persons will not make damaging statements against themselves unless they are true." (4 Weinstein's Evidence (1988) p. 804-123; see also, 1 Witkin, Cal. Evidence (3d ed. 1986) § 688, p. 675.) If the declarant has reason to believe that an ostensibly damaging statement will have no adverse consequence, the rationale for the exception fails and the statement should be excluded. (4 Weinstein's Evidence, *supra*, at p. 804-133; see also, Note, *Declarations Against Penal Interest: Standards of Admissibility Under an Emerging Majority Rule* (1976) 56 B.U.L. Rev. 148, 154.) Thus, for example, it is well established that a statement made under a grant of immunity is not admissible as a declaration against penal interest. (*People* v. *Rice* (1976) 59 Cal.App.3d 998, 1006-1007 [131 Cal.Rptr. 330]; *United States* v. *Williams* (5th Cir. 1987) 809 F.2d 1072, 1083; *United States* v. *Gonzalez, supra,* 559 F.2d 1271, 1273.)

In a variety of other contexts as well, the risk of penal consequences from an ostensibly self-incriminatory statement has been found to be too attenuated to warrant admissibility. For example, a prisoner serving three consecutive life sentences was found to have "de facto immunity" and his statement was held to be inherently untrustworthy and inadmissible. (*United States* v. *Silverstein* (7th Cir. 1984) 732 F.2d 1338, 1346-1347.) And a statement by a declarant who knew the case against him was already overwhelming, and so had "little to lose" by acknowledging guilt, was likewise held inadmissible. (*United States* v. *Brandenfels* (9th Cir. 1975) 522 F.2d 1259, 1264.) Finally, and of particular relevance to the facts of this case, it has been recognized that an ostensibly self-incriminatory statement made under law enforcement questioning may be self-serving and thus untrustworthy if it could have been "motivated by expectations of leniency" or "made with the purpose of placating the authorities." (*United States* v. *Monaco, supra,* 735 F.2d at p. 1177; see also, *United States* v. *Riley* (8th Cir. 1981) 657 F.2d 1377, 1384.)

In this case, Sergeant Wingo assured Rauch he would not be prosecuted for any assistance given to defendant after the robbery. To repeat, Wingo told Rauch: "If you had no involvement in the robbery, and you are truthful about what happened after it, you have no fear of prosecution."[3]

---

[3] The majority gives this statement a strained and unnatural construction that empties it of significance. According to the majority, Rauch was told by Sergeant Wingo that "he should not [fear prosecution] if he was truthful and had taken no part at all in the crimes" and that because he "all but confessed that he was an accessory to the crimes committed" he "thereby admitted he had taken some part in those offenses" and thus Rauch's statement "falls outside any 'grant' or 'promise' the words could reasonably have been understood to offer." (Maj.

Although this assurance did not have all the trappings of a formal grant of immunity, it was a credible statement by a law enforcement officer that Rauch would not be prosecuted for providing assistance to defendant after the Riverside robbery; although the assurance was conditioned on Rauch's being "truthful," Wingo had already told Rauch that he did not believe Rauch's statement that defendant had arrived uninjured, so Rauch would reasonably expect that if he said defendant arrived injured, Wingo would accept the statement as truthful whether or not it was actually true. In sum, Rauch's statement when made was likely to be believed whether true or not, was what his interrogator wanted to hear, and would result in no adverse penal consequences to Rauch. It was a statement well calculated to placate the authorities and thereby terminate prolonged interrogation without serious risk of penal consequences.

For these reasons, I cannot agree that Rauch's out-of-court statement to Sergeant Wingo was properly admitted as a declaration against penal interest. Because I am persuaded by the majority's reasoning on the issue of prejudice, however, I concur in the ultimate conclusion that the admission of the evidence does not require reversal of the judgment.

Appellant's petition for a rehearing was denied August 29, 1990.

---

opn., *ante*, at p. 1253.) In other words, Sergeant Wingo's assurance, as construed by the majority, meant only that Rauch need not fear prosecution if he was truthful and neither participated in the robbery nor was guilty as an accessory for aiding the participants afterwards.

A reasonable person in Rauch's position would not have so understood Sergeant Wingo's statement. A legally sophisticated listener would have known that the crime of being an accessory to a felony "is separate and distinct from the felony" (*People* v. *Mitten* (1974) 37 Cal.App.3d 879, 883 [112 Cal.Rptr. 713]), and thus that an accessory to a robbery would have "no involvement in the robbery" itself. Any reasonable person in Rauch's position, whether legally sophisticated or not, would have noticed that Sergeant Wingo contrasted "involvement in the robbery" with "what happened after it," and from this would have drawn the same conclusion, namely, that Sergeant Wingo was providing assurance that the listener would not be prosecuted for acts committed *after* the robbery even though those acts could support a prosecution for being an accessory to a felony.