Filed 6/13/23 P. v. Saechao CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | C096047 |
| v. | (Super. Ct. No. 18FE014155) |
| DAVID SAECHAO, | |
| Defendant and Appellant. | |

A jury convicted defendant David Saechao of first degree murder and found true a special circumstance allegation that the murder was committed during the commission of a burglary. The trial court sentenced defendant to an indeterminate term of life in prison without the possibility of parole.

Defendant now contends the trial court erred in (1) excluding evidence of an anonymously written letter that, according to defendant, tended to show someone other than defendant killed the victim, and (2) instructing the jury with CALCRIM No. 371 [Consciousness of Guilt: Suppression and Fabrication of Evidence]. Finding no error or abuse of discretion, we will affirm the judgment.

BACKGROUND

After a night out in Sacramento, F.E. drove to check on his friend Guofang Wang because F.E. was worried after Wang did not respond to a text. F.E. saw the garage door at Wang's house was broken. There was a light on in the garage. F.E. knew Wang grew marijuana but F.E. was not involved in the operation.

1

F.E. called M.L. and asked M.L. to meet him and check on Wang's house because F.E. was concerned. M.L. and L.N. met F.E. at a parking lot near the house. The three drove to Wang's house in F.E.'s van, with M.L. driving. M.L. saw the garage door was smashed in and did not see anyone around. He did not stop the van. But the three returned later. Evidence showed F.E.'s van traveling in the direction of Wang's house, at 1:58 am and then again at 4:04 a.m.

When they returned, M.L. and F.E. went to the front door. There was no response to M.L.'s knock. M.L. and F.E. entered the house upon discovering the front door open. L.N. did not go inside. F.E. saw Wang lying face down on the floor. M.L. and F.E. exited the house and M.L. called 911. The call was placed at 4:07 a.m. on June 24, 2018.

F.E., M.L. and L.N. waited for authorities to arrive, showed their driver's licenses to law enforcement officers and answered questions through an interpreter. They also provided DNA samples.

Sacramento County Sheriff's deputies responded to the scene in South Sacramento. It appeared that a car had rammed the garage door, leaving paint transfer on the door. Wang was found dead inside the house. It appeared he had been laying there for some time. There were abrasions and contusions on his face, chest, torso, back, arms, hand, leg, and knee. He had neck compression injuries. The People's forensic pathology expert opined that the causes of death were blunt force injuries and neck compression. The injuries were consistent with being kicked and punched in the head and body and manual strangulation.

Wang's body was in the hallway near the kitchen. There was evidence of a struggle near the kitchen and in the living room and area leading to a room in the back of the house. The house had been ransacked. But there were 550 marijuana plants in various stages of maturity, humidifiers, fans, and grow lights in the house and garage.

DNA analysis of blood drops on the driveway connected the blood to defendant. Defendant's DNA was also present on the cord around Wang's ankles, a door leaned over

2

Wang's body, a wall near Wang's body, the floor by the kitchen, a bed sheet, and Wang's right and left shoulder areas and neck. DNA found in Wang's fingernail scrapings was connected to defendant and defendant's uncle Lai Saechao.[1] Blood found on the front metal security door jamb was that of Lai. F.E., M.L. and L.N. were excluded as DNA contributors, except for a blood drop on the bedsheet where the results were inconclusive for F.E., M.L. and L.N.

Sometime between 2:00 p.m. on July 4, 2018, and 12:30 a.m. on July 5, 2018, defendant's car was left in a neighborhood in South Sacramento. The car remained at that location until law enforcement officers seized it on August 14, 2018. Although the steering column of the car had been "peeled," which could indicate that the car was stolen, defendant's car had not been reported stolen.

On July 19, 2018, defendant walked into the lobby of the Sacramento County Main Jail and told a deputy that he had killed someone and "wanted to get this over with." Defendant said he went to a marijuana grow house in the area of 47th Avenue and Stockton Boulevard that had damage to the garage four weeks prior, was attacked by an Asian male, fought back, and the Asian male bit him on the finger and forearm. Defendant had an injury to his left forearm and finger. Defendant later told Sacramento County Sheriff's detectives he was turning himself in for something that happened on 47th. He said he knew the house was a marijuana grow house and went there to take equipment. He did not tell the detectives he had killed someone.

Detectives interviewed Lai on August 11, 2018. When asked about the homicide

---

[1] Because defendant and his uncle share the same last name, we will refer to Lai by his first name for clarity. Defendant and Lai were tried together and we will refer to them collectively as defendants. This court decided Lai's appeal (case No. C091327) in March 2022.

on Burns Way, Lai denied any involvement in the homicide and repeatedly denied he had been in the house.

Defendant testified at trial and provided the following account. He went to Wang's house to steal grow lights. He was by himself. He used his car to push the garage door in and slid under the door. He then called Lai and asked that they meet at the house to get the money defendant owed Lai. Defendant did not tell Lai about a burglary. Defendant said he wrestled with a man inside the house and the man bit defendant's arm and finger. Defendant hit the man's face and chest. Lai got the man off defendant as the man was choking defendant on the front porch. Lai did not enter the house. Defendants fled in separate cars. Defendant saw the man getting up as he was leaving. Defendant said he turned himself in because he had committed a burglary and then heard on the news that someone had died; he said he felt bad and could not sleep. Defendant denied telling the deputy at the main jail that he had killed someone. He said he only admitted committing a burglary, but he lied to detectives that no one was with him at the house.

Lai also testified at the trial. He provided a similar account as defendant's with regard to defendant calling Lai to pick up money and Lai rescuing defendant from a man choking defendant. Lai testified that he did not know defendant was committing a burglary. He said he got scratched and bled a little during the struggle on the front porch.

The jury found defendant guilty of first degree murder. It found true the special circumstance allegation that the murder was committed during the commission of a burglary. The trial court sentenced defendant to an indeterminate term of life in prison without the possibility of parole.

DISCUSSION

I

Defendant argues the trial court erred in excluding evidence of an anonymously written letter that, according to defendant, tended to show someone other than defendant killed Wang.

4

## A

The People moved to exclude an anonymously written letter sent to the Sacramento Police Department after defendants were arrested. Lai moved to admit the letter. The letter stated:

> Hi police. I sorry but I cannot give you my name. I want to tell you guys that my friend die on Burns Way and 47th Avenue was still alive. My other friend call me out at 6/23/18 at sometimes around 3 am and told me that someone broke into the house on Burns Way and 47th Avenue. He told me that his friend had call him and told him that his house on Burns Way at the corner house that the door was open . . . before we had left from the house where he had to pick me up from. When we had got their, he walked inside first and I was scare entering the door because I was scared. When I had enter the front door I seen my friend talking to him already asking him what happened. I seen my friend the one I had came with told me to close the door. And I did that.
>
> I ask him to call the police but he said no to me. He said we could go to jail. I was so scare standing by the front door. I see my friend that I had came with holding a rag over the worker mouth. I did not question him for what he had did to him. . . . I thought my friend that I had came with was helping his. So I did not question him. I had told him to grab . . . some water for him. But it seems like he . . . didn't want to. I realize that my friend had kill him because he had a rag are some grey stuff blocking his face . . . which I know that it was already hard to breathe inside. I told him lets go and call the police but he was telling me to cut down the weed trees. At the same time he was looking for money because I see him digging around.
>
> I don't want feel guilty in the future but my friend kill him I know that for a fact. Before we left he took the recording DVR drive and took me to back to my place when I was going back I hear him calling his friend to come help clean up. I also . . . know that it was not him that call the police. Sorry . . . police but thats all I can give you guys. I will also leave some address where his other houses are at including his friend house. Every houses are growing. I wish you guys catch . . . my friend because hes greedy and selfish thats why he probably kill . . . him because he knows that he has 25 thousands plus on him. They do recycle in that house. So he gets paid . . . every few weeks. They know my family and they will kill me if I said there name. I'm just a worker just like him. I feel bad that he passed away. He came from East coast. Im from a different state myself. I know for a fact that my friend kill him and Im against that. Im a worker just like him trying to make money. So these are his places and friends house that I had been to a few someone else will tell you his name. . . .

The People argued that the letter constituted inadmissible hearsay and did not meet the requirements for admission as third party culpability evidence. They urged that the letter lacked indicia of reliability and theorized there was a substantial likelihood the letter was by a family member, friend or associate of defendants, intended to inject false information into the investigation. At the hearing, the People added that investigation into the addresses provided in the letter showed no connection between the addresses and any participants in the case.

Defendant opposed the People's motion, arguing the letter was admissible because it raised a reasonable doubt about his guilt. He claimed the letter named F.E., M.L. and L.N. as the responsible parties, and the three men were engaged in the marijuana operation at Wang's house, giving them a motive for murder. Defendant further asserted that the letter was reliable because it was received before defendants knew of F.E., M.L. and L.N.'s involvement in the case and the letter contained details consistent with information from F.E., M.L. and L.N. and connected the three men to the murder.

The trial court rejected the assertion that defendants had something to do with the letter based on discovery received from the prosecution, but said the timing of the letter was suspect. It ruled that the letter had little to no probative value because it was anonymous. It also ruled that the letter was substantially more prejudicial than probative in that its admission would invite speculation and create a trial within a trial. It further found the letter unreliable inasmuch as investigation into the addresses provided in the letter found no criminal activity at the addresses. Also, the author of the letter pointed a finger at other people. The trial court granted the People's motion.

B

Defendant contends the letter is admissible as third party culpability and nonhearsay evidence and to the extent the letter is hearsay, it is admissible as a declaration against penal interest under Evidence Code section 1230.

6

Third party culpability evidence is admissible if relevant, unless its probative value is substantially outweighed by the risk of undue delay, prejudice or confusion or it is otherwise inadmissible under the rules of evidence. (*People v. Turner* (2020) 10 Cal.5th 786, 816; *People v. Hall* (1986) 41 Cal.3d 826, 833.) Even if the letter qualifies as third party culpability evidence as defendant contends, it constitutes hearsay and defendant fails to establish it is admissible under Evidence Code section 1230. (But see *People v. Brady* (2010) 50 Cal.4th 547, 559 [holding that third party culpability evidence in the form of an anonymous letter claiming responsibility for the charged murder was properly excluded where the author of the letter was never identified].) It is proper to exclude third party culpability evidence if it is inadmissible hearsay. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1324-1325; *People v. Frierson* (1991) 53 Cal.3d 730, 746.)

We reject defendant's contention that the trial court did not exclude the letter on hearsay grounds. The People sought to exclude the letter as inadmissible hearsay. Although he did not cite Evidence Code section 1230 in the trial court, defendant countered that the letter was reliable. In ruling on the cross motions, the trial court stated that unlike the statements against penal interest in *Chambers v. Mississippi* (1973) 410 U.S. 284 [35 L.Ed.2d 297] (*Chambers*), the letter here did not incriminate the author but pointed a finger at other people. It found the letter unreliable, which as we shall explain is the focus of the Evidence Code section 1230 hearsay exception.

" 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) Hearsay evidence is inadmissible except as provided by law. (Evid. Code, § 1200, subd. (b).) Inasmuch as defendant offered the letter to show that F.E., M.L. and L.N. (and not defendant) killed Wang, the letter was offered for a hearsay purpose. (*People v. Masters* (2016) 62 Cal.4th 1019, 1061 (*Masters*).) Defendant did not argue in the trial court that the letter was offered for a

7

nonhearsay purpose. Accordingly, his argument is forfeited. (*People v. Ramos* (1997) 15 Cal.4th 1133, 1178; *People v. Frye* (1985) 166 Cal.App.3d 941, 950.)

The declaration against penal interest exception to the hearsay rule is set forth in Evidence Code section 1230, which provides that evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, so far subjected the declarant to the risk of criminal liability that a reasonable person in the declarant's position would not have made the statement unless the declarant believed it to be true. The focus of the Evidence Code section 1230 hearsay exception is the trustworthiness of the declaration. (*People v. Gordon* (1990) 50 Cal.3d 1223, 1251, overruled on another ground in *People v. Edwards* (1991) 54 Cal.3d 787, 834.) The proponent of the evidence must show that the statement is sufficiently reliable to warrant admission despite its hearsay character. (*People v. Westerfield* (2019) 6 Cal.5th 632, 704 (*Westerfield*).) " 'In determining whether a statement is truly against interest within the meaning of Evidence Code section 1230, and hence is sufficiently trustworthy to be admissible, the court may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant.' " (*Ibid.*) We review a trial court's ruling for abuse of discretion. (*People v. Clark* (2016) 63 Cal.4th 522, 590.)

In *Westerfield*, the defendant sought to admit evidence of a telephone call from an anonymous caller that supported the defendant's alibi defense. (*Westerfield, supra*, 6 Cal.5th at p. 704.) The appellate court found no basis to conclude that the caller believed his identity would be discovered, subjecting him to criminal liability, and no error in the trial court's finding that the evidence was not trustworthy because the basis for the caller's claimed knowledge could not be tested. (*Id.* at p. 705.) The appellate court held that the declaration against penal interest exception did not apply. (*Id.* at pp. 704-705.)

Here, there is no basis to conclude that the author of the letter believed the statements in the letter would subject the author to criminal prosecution. First, the author did not disclose his or her identity and there is no evidence the author believed the authorities could discover his or her identity. In addition, according to the letter, an unidentified friend killed Wang. As the trial court found, the author of the letter pointed a finger at another person. The author did not claim any responsibility for the killing. (*Clark v. Optical Coating Laboratory, Inc.* (2008) 165 Cal.App.4th 150, 172-173 [holding that statements implicating others and trying to avoid rather than assume liability do not provide any guarantee of reliability].) Thus, defendant fails to show that the letter was against the interest of the person who wrote it.

Further, the letter lacked indicia of reliability. The identities of the author and unnamed killer were unknown. (*Masters, supra*, 62 Cal.4th at p. 1061; *People v. Kerley* (2018) 23 Cal.App.5th 513, 573 (*Kerley*) [finding no abuse of discretion in excluding anonymous letter as third party culpability evidence where, among other things, the author of the letter was unknown and there was no evidence corroborating his or her statements].) There was no evidence connecting F.E., M.L. or L.N. to authorship of the letter. Also, detectives investigated the addresses referenced in the letter and found no connection to the case. And contrary to defendant's assertion, the evidence of traumatic injury to Wang's neck did not comport with the statement in the letter that the killer smothered Wang. The pathologist testified that Wang suffered hemorrhages to the muscles in his neck and fractures in his larynx caused by applying pressure to those areas. The causes of death were blunt force injuries and neck compression. The pathologist did not testify that Wang's injuries were consistent with a smothering. In contrast, the letter stated that the killer put a rag over the victim's mouth. The letter did not state that the killer applied pressure to the victim's neck or hit or kicked the victim. Based on the above, it was reasonable for the trial court to find the letter unreliable.

Defendant relies on *Chambers, supra*, 410 U.S. 284, but that case is inapposite because here defendant fails to demonstrate that the letter bore persuasive assurances of trustworthiness. The trial court in this case did not abuse its discretion in excluding evidence of the letter.

II

Defendant also argues the trial court erred in instructing the jury with CALCRIM No. 371 [Consciousness of Guilt: Suppression and Fabrication of Evidence]. He claims there is no substantial evidence from which a jury could find that defendant tried to conceal evidence.

The trial court instructed the jury pursuant to CALCRIM No. 371 as follows: "If a defendant tried to hide evidence, that conduct may show that he was aware of his guilt. If you conclude that a defendant made such an attempt, it is up to you to decide its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself. If you conclude that a defendant tried to hide evidence, you may consider that conduct only against that defendant. You may not consider that conduct in deciding whether any other defendant is guilty or not guilty."

Although defendant did not object to the CALCRIM No. 371 instruction in the trial court, we nevertheless consider his contention because he argues the instructional error affected his substantial rights. (*People v. Salcido* (2008) 44 Cal.4th 93, 155.) We review the claim de novo. (See *People v. Hart* (1999) 20 Cal.4th 546, 620 (*Hart*).)

Addressing the merits, we conclude there was no instructional error in giving the challenged instruction. A consciousness of guilt instruction is warranted if there is some evidence that, if believed by the jury, would sufficiently support the suggested inference. (*People v. Coffman & Marlow* (2004) 34 Cal.4th 1, 102.) The evidence need not conclusively establish that defendant attempted to conceal evidence. (See *Kerley, supra*, 23 Cal.App.5th at pp. 565-566.)

10

Defendant admitted using his car to ram Wang's garage. The paint transfer on the garage door was the same color as defendant's car. Defendant's car was left somewhere about 10 days after Wang's body was discovered. The car was not reported stolen. In his closing statement, defendant's trial counsel said one reasonable inference from the evidence was that the car was abandoned. The record contains evidence from which the jury could reasonably find that defendant attempted to hide evidence. (*Hart, supra*, 20 Cal.4th at p. 621 [holding that predecessor instruction to CALCRIM No. 371 was properly given where, among other things, the defendant used plywood to shield the car used in the charged offenses from view]; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1139-1140; *People v. Williams* (1996) 46 Cal.App.4th 1767, 1780 [concluding that it was reasonable to assume that the defendant hid the clothing he wore on the day of the attacks where the police could not find the clothing in a search of his residence].)

## DISPOSITION

The judgment is affirmed.

/S/
MAURO, J.

We concur:

/S/
ROBIE, Acting P. J.

/S/
RENNER, J.